162 P.3d 2

**Jacquelyn Louise PRELL,**
**Plaintiff–Appellee,**

v.

**Robert O. SILVERSTEIN,**
**Defendant–Appellant.**

No. 27812.

Intermediate Court of Appeals of Hawai'i.

May 30, 2007.

Harry Eliason, on the briefs, for defendant-appellant.

Gary C. Zamber, on the briefs, for plaintiff-appellee.

WATANABE, PRESIDING J., and FOLEY and FUJISE, JJ.

Opinion of the Court by WATANABE, J.

Defendant–Appellant Robert O. Silverstein (Silverstein) appeals the Divorce Decree entered by the Family Court of the Third Circuit[1] (family court) on December 7, 2005 and the Order Denying Defendant's Motion for Reconsideration of Judgment and/or New Trial entered by the family court on February 8, 2006.

Silverstein contends that the family court (1) erred when it concluded that a premarital agreement entered into between him and Plaintiff–Appellee Jacquelyn Louise Prell (Prell) was not valid; (2) erred when it determined that his investment in a 27.10–acre piece of property in Kalapana (Kalapana property) "was Category 5 property despite it's [sic] purchase with Category 3 money" and thereafter limited his "recovery of Category 3 funds" to $29,700.00; and (3) abused its discretion when it ordered the Kalapana property to be sold and the proceeds from the sale divided with Prell.

We agree with Silverstein's first and second contentions. However, we conclude that the family court did not abuse its discretion when it ordered the sale of the Kalapana property to satisfy Silverstein's debts and child support obligations. Accordingly, we vacate in part and affirm in part the Divorce Decree, reverse the family court's order denying Silverstein's motion for reconsideration, and remand for further proceedings.

## FACTUAL BACKGROUND

Silverstein and Prell were married on March 22, 1983 in Kailua–Kona, Hawai'i. According to Prell, they "entered into the marriage with nothing[.]" Silverstein similarly testified that at the time of their marriage, he and Prell "were relatively indigent but we did own—you know, we both had checking accounts, and we had a car. Maybe two cars, I don't recall." During their marriage, Silverstein received or inherited stocks and monetary gifts totaling $165,000.00 in cash value from members of his family.

Prior to their marriage, Silverstein and Prell signed a handwritten "Pre–Nuptial Agreement" dated March 15, 1983 (premarital or prenuptial agreement), which stated, in relevant part:

Prior to our marriage, we the undersigned, Robert Silverstein and Jacquelyn Prell, do

---

1. The Honorable William S. Chillingworth pre-  sided.

hereby agree to the following financial settlement in case of our divorce or separation: We both agree not to sue each other for money or other assets, in case of divorce or separation. To this end, we agree to keep personal assets personal—such as all bank accounts, checking, savings, stocks [and] bonds, cars or other vehicles, and/or any real estate, homes, land, buildings, or any personal business or businesses. In case of divorce or separation, those assets will remain with the one who owns the asset, or who is the registered or legal owner. If any assets are jointly owned, we agree to divide these equally, unless otherwise agreed upon. If we ever divorce or separate, we also agree to care for our daughter, or other children, to the best of our abilities. A copy of this Agreement shall be considered legal and valid.

Silverstein testified at trial that he and Prell talked about the agreement and he "wasn't going to marry her unless she signed the prenuptial agreement. Because [he] had no reason—legal reason to marry her. No real reason to marry her without a prenuptial agreement in effect." At trial, Silverstein explained why he had insisted on a prenuptial agreement:

> [A]ll I know is that a friend of mine had lost millions of dollar [sic] to two of his wives and he insisted he have a prenuptial agreement. That was in the news a lot in the '70s. And I had a prenuptial in 1980 when we got married for the first time in the eyes of god with the Universal Life Church. We rewrote it because we were going to get married in '83. And then we wrote it again one week before our marriage because this is what we both finally settled on. This was the simple plain English agreement that any ten-year-old could interpret.

Prell testified that she "might have signed something like [the premarital agreement] . . . as a way to humor [Silverstein] or, . . . didn't maybe see anything that could hurt by signing it." At trial, Prell was questioned about the signing of the premarital agreement and the following colloquy ensued:

Q. Let me ask you then, now that you have seen a copy of this [premarital agreement], do you recall having input into any of the content? Did you suggest any of the language or anything like that?

A. No.

Q. Um, with regard to anything that may have occurred leading up to this document, did you and [Silverstein] exchange information about what assets or debts you each might have entering into the marriage?

A. No, because we really entered into the marriage with nothing, you know.

Q. So he didn't disclose to you that he might have had something held for him by anyone else or anything like that?

A. He might have disclosed something about his grandmother. I don't even remember that. That was more surprise— or an aunt. He had an aunt who left—this was much later, but much later she died and left the children, the three oldest daughters, and him money.

Q. Okay. Did you—apparently you signed it. Prior to signing did you have an opportunity to consult with an attorney regarding this document?

A. No.

Q. And what if any benefit did you receive by signing this document?

A. Ah, the benefit might be that I wouldn't incur [Silverstein's] debts or that, um—

Q. Did he have any debts that he disclosed to you at the time of the execution of this document?

A. No, not at that time.

Q. Did he—did you receive anything of value at the time of the signing of the document?

A. No.

The parties have five children together, including three who were still minors when Prell filed the underlying divorce action against Silverstein on October 25, 2004.

On February 3, 1999, Silverstein, "for the Save Hawaii Help Rescue The Earth Corporation," [2] entered into an Agreement of Sale

---

2. Defendant–Appellant Robert O. Silverstein has

not contested Finding of Fact (FOF) No. 11 of

to purchase the unimproved 27.10–acre Kalapana property from Robert P. Keliihoomalu (Keliihoomalu or Seller). The Agreement of Sale provided that the purchase price for the Kalapana property was $109,000.00, payable as follows:

> $25,000.00 cash by February 8, 1999, and $700.00 per month for 120 months commencing March 1, 1999 and the first of each month thereafter deposited by the Buyer directly into the [S]eller's account. Any payment not received on or before the **first** day of the month is subject to a ten percent (10%) penalty and interest at two percent (2%) per month until paid. Buyer has the option to pay off the loan in full by February 1, 2006 for a total price of $75,000 at 12% interest.

Silverstein used $25,000.00 of a $70,000.00 monetary gift from his mother to make the initial down payment.

By a Warranty Deed dated October 25, 1999 and recorded in the Bureau of Conveyances on January 25, 2000, Keliihoomalu, as trustee for the Keliihoomalu Family Revocable Trust and "[i]n fulfillment of [the] Agreement of Sale with [Silverstein], for the Save Hawaii Foundation[,]" conveyed the Kalapana property to John F. Caverly (John) and Catherine Hyde Caverly (Catherine), a married couple (collectively, the Caverlys), and to "Family Fruit Farm, a Hawaii business dba[,]" as tenants in common. In Finding of Fact (FOF) No. 13 of the Findings of Fact and Conclusions of Law entered on December 7, 2005 (December 7, 2005 Findings and Conclusions), the family court found that "Family Fruit Farm is a Hawaii business with [Silverstein] as its sole proprietor." This finding has not been challenged on appeal. The family court also found that

> [Silverstein] spent an additional $1,500.00 of [the $70,000.00 monetary gift from his mother] when the [Kalapana] property was acquired by the Caverlys and Family Fruit Farm. The Caverlys paid $40,000.00 for their one-half interest. [Silverstein] also spent another $3,200.00 of the money from

the Findings of Fact and Conclusions of Law entered by the Family Court of the Third Circuit (family court) on December 7, 2005 that "Save Hawaii Help Rescue the Earth Corporation is an

his mother to build on the lot. There is no debt owing on the Kalapana property.

FOF No. 24.

In August 2001, Silverstein and Prell separated. They were then living in separate compounds on the Kalapana property. Prell lived with the minor children and John, who had since divorced Catherine. Silverstein lived by himself on a different part of the Kalapana property.

## PROCEDURAL BACKGROUND

On October 25, 2004, Prell filed a complaint for divorce alleging that her "[m]arriage [to Silverstein] is irretrievably broken." During the proceedings below, Silverstein asserted, based on the premarital agreement, that he was the sole owner of Family Fruit Farm's one-half interest in the Kalapana property.

On December 7, 2005, the family court entered a Divorce Decree, which among other things, dissolved the marriage between the parties; awarded legal and physical custody of the minor children to Prell, subject to Silverstein's rights of reasonable visitation; and ordered Silverstein to pay $150.00 per month ($50.00 per child) for the support and maintenance of the minor children until each child attained the age of eighteen, graduated from high school, or discontinued high school, whichever occurred last. The Divorce Decree also ordered the sale of the Kalapana property; directed that the proceeds of the sale be used to pay for the parties' joint debts and repay Silverstein $29,700.00 as his Category 3 contribution towards the purchase of one-half interest in the Kalapana property; and ordered that "the balance of the net proceeds shall be divided equally between the parties. However, from [Silverstein's] share of this balance, escrow shall pay to [Prell] the sum of $1,650.00 for child support owing to [Prell] through October 1, 2005, and any other child support owing and unpaid since that date."

unincorporated non-profit organization in which both [he and Plaintiff–Appellee Jacquelyn Louise Prell] participated."

In its December 7, 2005 Findings and Conclusions, the family court concluded as to the premarital agreement, in relevant part, as follows:

6. The March 15, 1983 pre-marital agreement is unenforceable. The agreement predates the adoption of the Hawaii Uniform Premarital Agreements Act, and thus is enforceable only if otherwise valid as a contract between the parties. The March 15, 1983 document fails because no consideration is given, because the agreement was unconscionable when entered into by the parties, because [Prell] was not provided a fair and reasonable disclosure of [Silverstein's] finances before execution, and did not waive her right to that disclosure, and because [Prell] was unrepresented and did not have adequate knowledge of [Silverstein's] property or financial obligations. In addition, in 2001 the parties entered into a subsequent written agreement replacing their premarital agreement with a Separation Agreement for an Uncontested Divorce [3] thus replacing any prior agreements they may have made.

(Footnote added.) In so concluding, the family court applied Hawaii Revised Statutes (HRS) § 572D–10 (2006 Repl.), which states now as it did when the proceedings below occurred, that "[a]ll written agreements entered into prior to July 1, 1987, between prospective spouses for the purpose of affecting any of the provisions of [the Uniform Premarital Agreement Act] shall be valid and enforceable if otherwise valid as contracts."

As to the division of the parties' property, the family court concluded, in relevant part, as follows:

7. There is no marital separate property. While [Silverstein] unquestionably had separate assets on the date of marriage and received separate assets subsequent to marriage, these assets were not excluded from the marital partnership by a valid contract nor were they maintained separate and apart from assets acquired, at least in part, with marital partnership income or property.

3. This "Separation Agreement" was never introduced into evidence at trial, and there is no

8. [Prell] had no Category 1 property. [Silverstein's] Category 1 property consisted of the $35,000.00 in cash held for him by his parents and the $130,000.00 in cash held for him by his aunt on the date of marriage. These funds, along with Category 3 [Silverstein] acquired before 1999, funds acquired by the parties through their joint marital efforts, and funds invested by partners, were used to purchase and improve the three Beach Road properties. All of these funds were lost when those properties were lost through foreclosure, surrender and sale. As a result of the loss of these properties both [Prell] and [Silverstein] were saddled with a deficiency judgment which each discharge [sic] in bankruptcy. [Silverstein] is not entitled to a Category 1 credit nor is he entitled to a Category 3 credit for any monies he received before 1999.

9. Because the parties have not provided the Court with any evidence to determine the current net market value of the marital interest in the Kalapana property, and because [Silverstein] has expressed his desire to sell his interest and move from the property, the parties should each be paid their respective interests in that property from the sale of the fractional interest purchased by Family Fruit Farm.

10. The $70,000.00 [Silverstein] received from his mother after the parties lost the Beach Road properties and secured their bankruptcy discharges is [Silverstein's] Category 3 property. Because $29,700.00 of that was invested by [Silverstein] in the Kalapana property, [Silverstein] is entitled to recover that amount from the proceeds of the sale of the Family Fruit Farm interest in that property.

11. Because the March 15, 1983 agreement is not a valid premarital agreement, Family Fruit Farm's fractional interest in the Kalapana property, even though purchased with Category 3 money, is Category 5 property. From the net sale proceeds of that interest, [Silverstein] is entitled to recover his $29,700.00 in Category 3 funds.

discussion in the record on appeal as to the contents of this agreement, if it indeed existed.

12. After payment of [Silverstein's] Category 3 contribution, the joint debts of the parties owing to the State of Hawaii for the [Department of Human Services] overpayment and the state tax refund overpayment should be paid. The parties are each entitled to one-half of the balance remaining after the payment of these joint debts.

13. [Prell] is entitled to the sum of $1,650.00 through October 1, 2005 and an additional $150.00 per month in child support arrears from [Silverstein's] share of the net sale proceeds of the sale of the marital interest in the Kalapana property.

14. In addition, because [Silverstein] has earned nothing in the last five years even though he is capable of working and has shown no evidence that he is likely to generate income from which child support can be paid in the foreseeable future, the minor children of the parties are entitled to an order requiring the payment of child support from [Silverstein's] share of the net sale proceeds.

15. Pursuant to the agreement of the parties placed on the record at trial, each party should be awarded the personal property, including but not limited to accounts, businesses and vehicles in the possession of that party, and each should be separately responsible for the debts incurred by that party, all without contribution or equalization payment from the other.

On December 14, 2005, Silverstein filed a Motion for Reconsideration of Judgment and/or New Trial. In the motion, he contended "that the [Findings] are not supported by law or the facts of this case, the [Findings] are not clear as to what facts were legally significant to base the Findings upon and ... the result of the [Findings] is in violation of the model partnership division formula of Hawaii law." Silverstein also asserted that the March 15, 1983 premarital agreement "is legal and binding and should have been the basis of the court's [Findings]." Finally, Silverstein argued that "[t]he order requiring the [Kalapana] land sold and the proceeds divided is an abuse of discretion" because

the only potential buyer of this property is [John,] who is currently the other joint tenancy owner. Potentially [Prell] may also lose her interest in this property due to she not being married to [John]. This provision is likely to result in both [Silverstein] and [Prell] losing their homes with little or no value coming [their] way.

On February 8, 2006, the family court denied Silverstein's motion for reconsideration, concluding that the Divorce Decree "accurately reflects the facts of this case and correctly applies the law to those facts[.]" On March 8, 2006, Silverstein timely filed a notice of appeal.

## DISCUSSION

### A. *General Principles Governing Divorce Distribution of Property*

HRS § 580–47 (2006 Repl.) provides now, as it did when Prell's underlying complaint for divorce was filed, in relevant part, as follows:

**Support orders; division of property.** (a) Upon granting a divorce, or thereafter if, in addition to the powers granted in subsections (c) and (d), jurisdiction of those matters is reserved under the decree by agreement of both parties or by order of court after finding that good cause exists, the court may make any further orders as shall appear just and equitable (1) compelling the parties or either of them to provide for the support, maintenance, and education of the children of the parties; (2) compelling either party to provide for the support and maintenance of the other party; (3) finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate; and (4) allocating, as between the parties, the responsibility for the payment of the debts of the parties whether community, joint, or separate, and the attorney's fees, costs, and expenses incurred by each party by reason of the divorce. In making these further orders, the court shall take into consideration: the respective merits of the parties, the relative abilities of the parties, the condition in which each party will be left by the divorce, the burdens

imposed upon either party for the benefit of the children of the parties, and all other circumstances of the case. In establishing the amounts of child support, the court shall use the guidelines established under section 576D–7. Provision may be made for the support, maintenance, and education of an adult or minor child and for the support, maintenance, and education of an incompetent adult child whether or not the petition is made before or after the child has attained the age of majority. In those cases where child support payments are to continue due to the adult child's pursuance of education, the agency, three months prior to the adult child's nineteenth birthday, shall send notice by regular mail to the adult child and the custodial parent that prospective child support will be suspended unless proof is provided by the custodial parent or adult child to the child support enforcement agency, prior to the child's nineteenth birthday, that the child is presently enrolled as a full-time student in school or has been accepted into and plans to attend as a full-time student for the next semester a post-high school university, college, or vocational school. If the custodial parent or adult child fails to do so, prospective child support payments may be automatically suspended by the child support enforcement agency, hearings officer, or court upon the child reaching the age of nineteen years. In addition, if applicable, the agency, hearings officer, or court may issue an order terminating existing assignments against the responsible parent's income and income assignment orders.

In addition to any other relevant factors considered, the court, in ordering spousal support and maintenance, shall consider the following factors:

(1) Financial resources of the parties;

(2) Ability of the party seeking support and maintenance to meet his or her needs independently;

(3) Duration of the marriage;

(4) Standard of living established during the marriage;

(5) Age of the parties;

(6) Physical and emotional condition of the parties;

(7) Usual occupation of the parties during the marriage;

(8) Vocational skills and employability of the party seeking support and maintenance;

(9) Needs of the parties;

(10) Custodial and child support responsibilities;

(11) Ability of the party from whom support and maintenance is sought to meet his or her own needs while meeting the needs of the party seeking support and maintenance;

(12) Other factors which measure the financial condition in which the parties will be left as the result of the action under which the determination of maintenance is made; and

(13) Probable duration of the need of the party seeking support and maintenance.

The court may order support and maintenance to a party for an indefinite period or until further order of the court; provided that in the event the court determines that support and maintenance shall be ordered for a specific duration wholly or partly based on competent evidence as to the amount of time which will be required for the party seeking support and maintenance to secure adequate training, education, skills, or other qualifications necessary to qualify for appropriate employment, whether intended to qualify the party for a new occupation, update or expand existing qualification, or otherwise enable or enhance the employability of the party, the court shall order support and maintenance for a period sufficient to allow completion of the training, education, skills, or other activity, and shall allow, in addition, sufficient time for the party to secure appropriate employment.

(b) An order as to the custody, management, and division of property and as to the payment of debts and the attorney's fees, costs and expenses incurred in the divorce shall be final and conclusive as to both parties subject only to appeal as in civil cases. The court shall at all times,

including during the pendency of any appeal, have the power to grant any and all orders that may be necessary to protect and provide for the support and maintenance of the parties and any children of the parties to secure justice, to compel either party to advance reasonable amounts for the expenses of the appeal including attorney's fees to be incurred by the other party, and to amend and revise such orders from time to time.

▮ The Hawai'i Supreme Court has stated that the foregoing statute confers "wide discretion upon the family court." *Gussin v. Gussin,* 73 Haw. 470, 479, 836 P.2d 484, 489 (1992). However,

in adjudicating the rights of parties to a divorce, the family court strives for a certain degree of uniformity, stability, clarity or predictability in its decision-making and thus [family court judges] are compelled to apply the appropriate law to the facts of each case and be guided by reason and conscience to attain a just result. The partnership model is the appropriate law for the family courts to apply when exercising their discretion in the adjudication of property division in divorce proceedings.

*Tougas v. Tougas,* 76 Hawai'i 19, 28, 868 P.2d 437, 446 (1994) (citations, internal quotation marks, and brackets omitted).

Under general partnership law, "each partner is entitled to be repaid his [or her] contributions to the partnership property, whether made by way of capital or advances." 59A Am.Jur.2d *Partnership* § 476 (1987) (footnotes omitted). *Absent a legally permissible and binding partnership agreement to the contrary,* "partners share equally in the profits of their partnership, even though they may have contributed unequally to capital or services." *Id.* § 469 (footnotes omitted). Hawaii partnership law provides in relevant part as follows:

**Rules determining rights and duties of partners.** The rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them, by the following rules:

(a) Each partner shall be repaid the partner's contributions, whether by way of capital or advances to the partnership property and share equally in the profits and surplus remaining after all liabilities, including those to partners, are satisfied; and must contribute towards the losses, whether of capital or otherwise, sustained by the partnership according to the partner's share in the profits.

*Gardner v. Gardner,* 8 Haw.App. 461, 464–65, 810 P.2d 239, 242 (1991) (quoting HRS § 425–118(a) (1985)). *Therefore, if there is no agreement between the husband and wife defining the respective property interests,* partnership principles dictate an equal division of the marital estate "where the only facts proved are the marriage itself and the existence of jointly owned property." *Gussin,* 73 Haw. at 484, 836 P.2d at 491 (quoting *Hashimoto,* 6 Haw. App. at 427 n. 4, 725 P.2d at 522 n. 4 (1986)).

*Id.* at 27–28, 868 P.2d at 445–46 (emphases added).

In *Hussey v. Hussey,* 77 Hawai'i 202, 881 P.2d 1270 (App.1994), this court construed *Tougas* as establishing three classifications of property that must be divided and distributed in a divorce proceeding:

**Premarital Separate Property.** This was the property owned by each spouse immediately prior to their marriage or cohabitation that was concluded by their marriage. Upon marriage, this property became either Marital Separate Property or Marital Partnership Property.

**Marital Separate Property.** This is the following property owned by one or both of the spouses at the time of the divorce:

a. All property that was excluded from the marital partnership by an agreement in conformity with the Hawai'i Uniform Premarital Agreement Act (HUPAA), HRS chapter 572D (Supp.1992). The HUPAA states in relevant part as follows:

§ 572D–3 **Content.** (a) Parties to a premarital agreement may contract with respect to:

(1) The rights and obligations of each of the parties in any of the property of

either or both of them whenever and wherever acquired or located;

(2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

(3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

※　　※　　＊　　＊　　＊　　＊

b. All property that was excluded from the marital partnership by a valid contract. *Tougas*, 76 Hawai'i at 24, 868 P.2d at 442; and

c. All property that (1) was acquired by the spouse-owner during the marriage by gift or inheritance, (2) was expressly classified by the donee/heir-spouse-owner as his or her separate property, and (3) after acquisition, was maintained by itself and/or sources other than one or both of the spouses and funded by sources other than marital partnership income or property.

**Marital Partnership Property.** All property that is not Marital Separate Property.

*Id.* at 206–07, 881 P.2d at 1274–75. We also noted that

4. The five categories of Marital Partnership Property net market values (NMVs) that are identified in *Tougas v. Tougas*, 76 Hawai'i 19, 868 P.2d 437 (1994), are as follows:

Category 1. The [NMV], plus or minus, of all property separately owned by one spouse on the date of marriage (DOM) but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 2. The increase in the NMV of all property whose NMV on the DOM is included in category 1 and that the owner separately owns continuously from the DOM to the DOCOEPOT [(]date of the conclusion of the evidentiary part of the trial[)].

Category 3. The date-of-acquisition NMV, plus or minus, of property separately acquired by gift or inheritance during the marriage but excluding the NMV attributable to property that is subsequently legally gifted by the owner to the other spouse, to both spouses, or to a third party.

Category 4. The increase in the NMV of all property whose NMV on the date of acquisition during the marriage is included in category 3 and that the owner separately owns continuously from the date of acquisition to the DOCOEPOT.

Category 5. The difference between the NMVs, plus or minus, of all property owned by one or both of the spouses on the DOCOEPOT minus the NMVs, plus or minus, includable in categories 1, 2, 3, and 4.

The NMVs in Categories 1 and 3 are the parties' capital contributions to the marital partnership. The NMVs in Categories 2 and 4 are the during-the-marriage increase in the NMVs of the Categories 1 and 3 properties owned at DOCOEPOT. Category 5 is the DOCOEPOT NMV in excess of the Categories 1, 2, 3, and 4 NMVs. In other words, Category 5 is the net profit or loss of the marital partnership after deducting the partners' capital contributions and the during-the-marriage increase in the NMV of property that was a capital contribution to the partnership and is still owned at DOCOEPOT.

*Id.* at 27, 868 P.2d at 445 (brackets and citations omitted).

[a]lthough Marital Separate Property cannot be used by the family court to "offset," *Id.* at 32, 868 P.2d at 450, the award of Marital Partnership Property to the other spouse, it can be used by the family court to "alter the ultimate distribution of Marital Partnership Property based on the respective separate conditions of the spouses." *Id.* In other words, Marital Separate Property is property that has been validly excluded from the marital partnership. *Although the family court may allow Marital Separate Property to reasonably influence the division and distribution of Marital Partnership Property, it cannot award any Marital Separate Property to the non-owner spouse.* Consequently, the five categories of NMVs listed in *Tougas,* [4] 76 Hawai'i at 27, 868 P.2d at 445, apply only to Marital Partnership Property, not to Marital Separate Property.

*Id.* at 207, 881 P.2d at 1275 (ellipsis and brackets omitted; footnote added).

B. *The Validity of the Premarital Agreement*

■ The family court concluded that the March 15, 1983 premarital agreement signed by Prell and Silverstein was unenforceable, Conclusion of Law (COL) No. 6, and that there was no marital separate property.

COL No. 7. According to the family court, "[w]hile [Silverstein] unquestionably had separate assets on the date of marriage and received separate assets subsequent to marriage, these assets were not excluded from the marital partnership by a valid contract nor were they maintained separate and apart from assets acquired, at least in part, with marital partnership income or property." COL No. 7.

██ We review the family court's conclusions of law *de novo* under the right/wrong standard. *Teller v. Teller,* 99 Hawai'i 101, 107, 53 P.3d 240, 246 (2002). This standard requires us to "examine the facts and answer the question without being required to give any weight to the [family] court's answer to it." *Id.* (internal quotation mark omitted). In other words, we review a conclusion of law freely for its correctness. *Id.*

The March 15, 1983 premarital agreement signed by Prell and Silverstein predated July 1, 1987, the effective date of the Hawai'i Uniform Premarital Agreement Act (HUPAA), HRS chapter 572D. Pursuant to HRS § 572D–10 (2006 Repl.), "[a]ll written agreements entered into prior to July 1, 1987, between prospective spouses for the purpose of affecting any of the provisions of this chapter shall be valid and enforceable if otherwise valid as contracts."

The family court concluded that the March 15, 1983 premarital agreement between Prell and Silverstein was an unenforceable agreement

> because no consideration is given, because the agreement was unconscionable when entered into by the parties, because [Prell] was not provided a fair and reasonable disclosure of [Silverstein's] finances before execution, and did not waive her right to that disclosure, and because [Prell] was unrepresented and did not have adequate knowledge of [Silverstein's] property or financial obligations.

We disagree.

### 1.

██ We note at the outset that other courts have held, and we agree, that marriage is adequate consideration for premarital agreements. *See, e.g., Bratton v. Bratton,* 136 S.W.3d 595, 600 (Tenn.2004) ("[m]arriage itself is sufficient consideration for a prenuptial agreement"); *Akileh v. Elchahal,* 666 So.2d 246, 248 (Fla.Dist.Ct.App. 1996) ("marriage is sufficient consideration to uphold an antenuptial agreement"); 41 Am.Jur.2d *Husband and Wife* § 91 (2006) ("courts have generally held that the marriage itself may be sufficient consideration for an antenuptial or prenuptial agreement. It has also been held that a couple's relinquishment of rights in each other's estate is adequate consideration for antenuptial agreement."). (Footnote omitted.)

In *Barnhill v. Barnhill,* 386 So.2d 749 (Ala.Civ.App.1980), several weeks prior to their marriage, the parties had executed an antenuptial agreement that provided, in pertinent part, as follows:

> 5. It is agreed, in the event of a separation, that each party shall have no right as against the other by way of claims for support, alimony, attorneys' fees, costs or division of property.
>
> 6. It is further agreed that this agreement is entered into with a full knowledge on the part of each party as to the extent and probable value of the estate of the other and of all of the rights conferred by law upon each in the estate of the other by virtue of said proposed marriage, but it is their desire that their respective rights to each other's estate shall be fixed by this agreement, which shall be binding upon their respective heirs and legal representatives.

*Id.* at 750. After four years of marriage, the wife petitioned for divorce and requested alimony and a property settlement. *Id.* at 751. In his answer, the husband claimed that the antenuptial agreement barred any interest in his estate. *Id.* The wife argued that the agreement was

> invalid because there was not adequate consideration for the wife relinquishing her rights in the husband's estate. Put another way, the wife contend[ed] that the only consideration given her was the husband's relinquishment of any interest in the wife's estate and since the husband's estate was much larger than the wife's, the agreement

was not based upon adequate consideration.

*Id.*

The Alabama Court of Civil Appeals disagreed with the wife and held:

Marriage may, under appropriate circumstances, be sufficient consideration for an antenuptial agreement. This is particularly true when other factors are present such as the husband's relinquishment of any rights that he might have in the wife's estate.

In this instance, marriage was clearly part of the consideration for executing the agreement. The husband was adamant in demanding that the wife sign an antenuptial agreement before he would marry the wife. The record indicates that the wife at first was reluctant to sign such an agreement. The husband then informed the wife that he would not marry her unless she signed the agreement. It was only after these events that the wife signed the agreement. Thus, with the above in mind, it can be concluded that the marriage itself was sufficient consideration to support the antenuptial agreement.

In addition, the husband by signing the agreement gave up any right in what could be classified as the wife's substantial estate. This relinquishment was also valuable consideration. Thus, the wife's contention that there was inadequate consideration is without merit.

*Id.* (citations omitted).

Here, Silverstein testified as follows:

Q. And did she negotiate with you for things, or tell you the things that she wanted to be—the language she wanted reflected in the [March 15, 1983] agreement?

A. I think she wanted me to—like she wanted to think about it overnight is I think the only thing that she wanted to do. But I think we talked about it and I wasn't going to marry her unless she signed the prenuptial agreement. Because I had no reason—legal reason to marry her. No

real reason to marry her without a prenuptial agreement in effect.

Q. And did you communicate that to her, that was a condition of marriage?

A. Oh, obvious. It says it right there that this is a condition of marriage.

In light of the foregoing testimony, which appears to be undisputed, marriage was clearly part of the consideration for the execution of the premarital agreement between Prell and Silverstein. Additionally, Prell and Silverstein both relinquished their respective rights in each other's estate as part of their premarital agreement. This relinquishment of rights also constituted consideration for the March 15, 1983 premarital agreement.

### 2.

In *Lewis v. Lewis,* 69 Haw. 497, 748 P.2d 1362 (1988),[5] the Hawai'i Supreme Court held that premarital agreements entered into prior to the enactment of the HUPAA are

valid and enforceable if otherwise valid as contracts. Unless the agreement rises to the level of unconscionability, a merely "inequitable" contract is not unenforceable under contract law.[1] Furthermore, when a premarital agreement setting forth support and property division in the event of divorce is *not unconscionable* and has been *voluntarily* entered into by the parties with knowledge of the financial situation of the prospective spouse, enforcement of the agreement does not violate the principle of a "just and equitable" award under HRS § 580–47.

---

1. Nor can it be said that enforcement of inequitable premarital agreements violates public policy as the Hawaii Act itself reflects a public policy in favor of enforcement of such agreements.

*Id.* at 500–01, 748 P.2d at 1365–66. In reviewing the premarital agreements at issue in *Lewis,* the supreme court stated that

the only plausible grounds for not enforcing the [premarital] agreement under contract law are: 1) the absence of true assent

5. The supreme court's opinion in *Lewis v. Lewis,* 69 Haw. 497, 748 P.2d 1362 (1988), covered two unconsolidated cases with related legal issues:

*Lewis v. Lewis* and *Reese v. Reese. Lewis,* 69 Haw. at 498, 748 P.2d at 1364.

to the agreement due to duress, coercion, undue influence, or any other circumstance indicating that [the spouse] did not freely and voluntarily enter into the agreement; and 2) unconscionability.

*Id.* at 501, 748 P.2d at 1366.

### 3.

The record on appeal contains no evidence to support a conclusion that Prell signed the premarital agreement under duress, coercion, undue influence, or any other circumstance that suggested a lack of free will or voluntariness on her part. Indeed, during the divorce trial, Prell admitted that "I might have signed something like [the March 15, 1983 premarital agreement], you know, as a way to humor [Silverstein] or, you know—I didn't maybe see anything that could hurt by signing it."

### 4.

■ In *Lewis,* the supreme court explained that the basic test of unconscionability in commercial cases

is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. The principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power.

*Id.* (ellipsis and citations omitted) (quoting the comment to HRS § 490:2–302). As applied to premarital agreements, the supreme court stated that

two basic principles are encompassed within the concept of unconscionability, one-sidedness and unfair surprise. As applied to premarital agreements, one-sidedness would mean that the agreement leaves a post-divorce economic situation that is unjustly disproportionate. Unfair surprise would mean that one party did not have full and adequate knowledge of the other party's financial condition when the premarital agreement was executed.

*Id.* at 502, 748 P.2d at 1366. The supreme court concluded that in determining whether a *support* provision of a premarital agreement is unconscionable, "it is in the best interest of the state that the financial well-being of the parties at the time of divorce be preserved by taking into consideration factors and circumstances arising throughout the marriage[.]" *Id.* That is, the unconscionability of a spousal support provision

can only be determined at the time of divorce by reviewing and considering all relevant factors and circumstances occurring after the execution of the premarital agreement. To enforce a spousal support provision of a premarital agreement because it was reasonable at the time of execution of the agreement can result in unforeseen economic hardship to a spouse that may shock the conscience of the court due to relevant changes in the circumstances of the marriage by the time of divorce. Public policy mandates against the enforcement of unconscionable support payments.

*Id.* at 503, 748 P.2d at 1367.

■ The supreme court also held, however, "that the public policy considerations ... relative to spousal support have no bearing on and applicability to property division in a premarital agreement." *Id.* at 507, 748 P.2d at 1369. Accordingly, "the issue of unconscionability of a provision governing division of property in a premarital agreement should be evaluated at the time the agreement was executed." *Id.*

The premarital agreement between Prell and Silverstein provided for property division and not spousal support. Applying the *Lewis* test for evaluating unconscionability of property division premarital agreements, we conclude that the March 15, 1983 premarital agreement was not unconscionable.

It is undisputed that at the time the premarital agreement was executed, both Prell and Silverstein did not have any assets. Prell even testified at the divorce trial that "we really entered into the marriage with nothing[.]" Prell thus had full and adequate disclosure of Silverstein's financial condition

at the time the March 15, 1983 premarital agreement was executed.[6]

At the divorce trial, Silverstein testified, "In fact when I received *the first check from my Aunt Rose, I think was 1990,* I was absolutely floored because it was a $10,000 check. And underneath of it there was more." (Emphasis added.)

There is no evidence in the record that at the time the premarital agreement was executed, Silverstein or Prell had any knowledge or reasonable expectation that either would thereafter receive any gift(s) or inheritance(s). Thus, there is no indication in the record that at the time of its execution, the premarital agreement was one-sided or contained terms that were unfairly surprising to either party so as to render the agreement unconscionable.

In *Reese v. Reese,* an unconsolidated case considered by the supreme court as part of the *Lewis* decision, the premarital agreement at issue reserved to Mr. Reese "premarital and inherited property as separate property not subject to division in case of divorce." *Id.* The supreme court held:

> After careful review of the record, we conclude that the reservation of premarital and inherited property, and the income from and any enhanced value of such property, to Mr. Reese was not unacceptably one-sided at the time the agreement was executed.
>
> As to the element of unfair surprise, the family court found that prior to the execution of the agreement, Mr. Reese had fully disclosed to Mrs. Reese the nature of his property holdings and a "not unrealistic" estimate of the value of his separate estate. Although our review of the record discloses conflicting evidence on this point, we

conclude that the family court's finding on this issue is not clearly erroneous.

In our view the agreement was not unconscionable because the premarital agreement, at the time of execution, was not unacceptably one-sided and did not involve unfair surprise. We hold that the agreement was a valid contract and should have been fully enforced by the family court. In determining the division of property between Mr. and Mrs. Reese, however, the family court stated that the agreement was only one factor it took into consideration. The family court did not make sufficient findings to allow us to determine the distribution of property that would result from full enforcement of the agreement. In light of our holding, the family court is directed, on remand, to redetermine the division of property in strict accordance with the agreement by entering appropriate findings of fact and conclusions.

*Id.* at 507–08, 748 P.2d at 1369–70. This holding is applicable to the facts in this case.

In summary, the marriage of Prell and Silverstein and their relinquishment of their rights in each other's estate constituted adequate consideration for their March 15, 1983 premarital agreement. No evidence was adduced that Prell signed the premarital agreement under duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness. Additionally, the premarital agreement was not unacceptably one-sided and did not involve terms of unfair surprise so as to render it unconscionable. Therefore, the family court erred in concluding that the March 15, 1983 premarital agreement was unenforceable.

### C. *The Family Court's Classification of the Kalapana Property*

■ Because the family court erroneously concluded that the premarital agreement

---

6. Even if Silverstein's mother and aunt collectively were holding approximately $165,000.00 for Silverstein at the time of the execution of the premarital agreement, the family court specifically found that Silverstein was not aware that the amount was being held for him. FOF No. 17. Moreover, the amount had not been delivered to Silverstein at the time of his marriage and consequently, no completed gift to Silverstein had been made. *See Welton v. Gallagher,* 2 Haw.App. 242, 247, 630 P.2d 1077, 1082 (1981)

(holding that "[f]or a transaction to amount to a gift, it must appear that there was a sufficient delivery of the property, an acceptance of the property, and an intention to make a gift.... A donor must divest himself [or herself] of control of the gift for delivery to be complete. In other words, the donor must do acts sufficient to strip himself [or herself] of dominion and control over the property"). (Citations, internal quotation marks, and brackets omitted.)

between Prell and Silverstein was invalid and unenforceable, it wrongly categorized the Kalapana property as Category 5 property and entered the following erroneous conclusions of law:

7. There is no marital separate property. While [Silverstein] unquestionably had separate assets on the date of marriage and received separate assets subsequent to marriage, these assets were not excluded from the marital partnership by a valid contract nor were they maintained separate and apart from assets acquired, at least in part, with marital partnership income or property.

. . . .

10. The $70,000.00 [Silverstein] received from his mother after the parties lost the Beach Road properties and secured their bankruptcy discharges is [Silverstein's] Category 3 property. Because $29,700.00 of that was invested by [Silverstein] in the Kalapana property, [Silverstein] is entitled to recover that amount from the proceeds of the sale of the Family Fruit Farm interest in that property.

11. Because the March 15, 1983 agreement is not a valid premarital agreement, Family Fruit Farm's fractional interest in the Kalapana property, even though purchased with Category 3 money, is Category 5 property. From the net sale proceeds of that interest, [Silverstein] is entitled to recover his $29,700.00 in Category 3 funds.

12. After payment of [Silverstein's] Category 3 contribution, the joint debts of the parties owing to the State of Hawaii for the DHS overpayment and the state tax refund overpayment should be paid. The parties are each entitled to one-half of the balance remaining after the payment of these joint debts.

As discussed above, the premarital agreement stated, in pertinent part, as follows:

[W]e agree to keep personal assets personal—such as all bank accounts, checking, savings, stocks [and] bonds, cars or other vehicles, and/or any real estate, homes, land, buildings, or any personal business or businesses. In case of divorce or separation, those assets will remain with the one who owns the asset, or who is the registered or legal owner.

The Kalapana property was initially purchased with money that Silverstein received as a gift from his mother, and Silverstein owned one-half interest in the Kalapana property during the marriage. Consequently, pursuant to the terms of the premarital agreement, the Family Fruit Farm's one-half interest in the Kalapana property and any appreciation of that interest during the marriage was Silverstein's marital separate property and should remain solely with Silverstein after the divorce.

### D. The Family Court's Order that Silverstein's Interest in the Kalapana Property be Sold

■ In *Hussey*, this court explained that [a]lthough Marital Separate Property cannot be used by the family court to "offset," *Id.* at 32, 868 P.2d at 450, the award of Marital Partnership Property to the other spouse, it can be used by the family court to "alter the ultimate distribution of Marital Partnership Property based on the respective separate conditions of the spouses." *Id.* In other words, Marital Separate Property is property that has been validly excluded from the marital partnership. Although the family court may allow Marital Separate Property to reasonably influence the division and distribution of Marital Partnership Property, it cannot award any Marital Separate Property to the non-owner spouse. Consequently, the five categories of NMVs listed in *Tougas*, 76 Hawai'i at 27, 868 P.2d at 445, apply only to Marital Partnership Property, not to Marital Separate Property.

*Hussey*, 77 Hawai'i at 207, 881 P.2d at 1275 (ellipsis and brackets omitted).

The record in this case indicates that Silverstein and Prell owed joint debts. Additionally, at the time the Divorce Decree was entered, Silverstein owed $1,650.00 in child support payments. The Divorce Decree ordered Silverstein to continue to make support payments for his minor children, who were seventeen, fourteen, and nine years old in 2005, until they attained the age of eighteen, graduated from high school, or discon-

tinued high school, whichever occurred last. The family court concluded that "because [Silverstein] has earned nothing in the last five years even though he is capable of working and has shown no evidence that he is likely to generate income from which child support can be paid in the foreseeable future, the minor children of the parties are entitled to an order requiring the payment of child support from [Silverstein's] share of the net sale proceeds." COL No. 14. Silverstein has not challenged this conclusion on appeal.

Since the Kalapana property is Silverstein's only asset and Silverstein has no other way to satisfy his outstanding debts and future child support obligations, the family court did not abuse its discretion in ordering Silverstein to sell his interest in the Kalapana property and use the proceeds to satisfy his outstanding debts and future child support obligations.

We note, however, that while the family court ordered the sale of the Kalapana property, it did not include in the order any details as to how the proceeds of the sale were to be used to satisfy Silverstein's future child support obligations. The family court should do so on remand.

## CONCLUSION

In light of the foregoing discussion, we vacate paragraph No. 8 of the Divorce Decree and COL Nos. 6, 7, 10, 11, and 12, which were included in the December 7, 2005 Findings of Fact and Conclusions of Law, and remand for further proceedings consistent with this opinion.

We also reverse the "Order Denying [Silverstein's] Motion for Reconsideration of Judgment and/or New Trial" entered by the family court on February 8, 2006.