(291 P.3d 494)
No. 106,092

In the Matter of the Marriage of DAVID M. TRASTER, *Appellee,*
and DEBRA C. TRASTER, *Appellant.*

Opinion filed December 7, 2012.

*Stephen P. Weir*, of Stephen P. Weir, P.A., of Topeka, for appellant.

*Kristy L. Simpson*, of Wichita, and *Gary L. Ayers*, of Foulston Siefkin LLP, of Wichita, for appellee.

Before STANDRIDGE, P.J., LEBEN and BRUNS, JJ.

STANDRIDGE, J.: During their marriage, Debra and David Traster executed a postmarital agreement setting forth the respective legal rights and obligations of each spouse in the event the marriage did not survive. After more than 25 years of marriage, David filed for divorce and—contrary to the terms of the postmarital agreement—requested the court equitably divide the marital property. Debra moved for partial summary judgment, asking the district court to find that the postmarital agreement was valid and enforceable and that it controlled the disposition of any and all of the parties' real and personal property.

The district court ultimately construed the postmarital agreement as a separation agreement and, as required by K.S.A. 60-

1610(b)(3), reviewed it to determine whether the agreement was valid, just, and equitable. After an evidentiary hearing, the court held the postmarital agreement (1) was invalid because it ran counter to public policy by encouraging divorce and (2) was unjust and inequitable in the distribution of property because Debra received virtually all of the personal property acquired during the marriage through gift, inheritance, and joint effort of the parties. On appeal, Debra alleges the district court erred in construing the postmarital agreement as a separation agreement under K.S.A. 60-1610(b)(3). Debra claims the district court was limited to reviewing the postmarital agreement to determine if it generally complied with contract principles. Reviewed in this context, Debra argues the agreement is not contrary to public policy and must be enforced as written. Finally, Debra claims she is entitled to an award of attorney fees based on an indemnity provision in the written agreement.

We conclude the district court erred in finding the postmarital agreement ran counter to public policy and in construing the postmarital agreement as a separation agreement under K.S.A. 60-1610(b)(3) for purposes of determining its enforceability. In the absence of a statute governing the law related to postmarital agreements between spouses who plan to continue their marriage, we conclude the appropriate standard for assessing the enforceability of postmarital agreement is review of the agreement by the court to determine whether (1) each party had an opportunity to obtain separate legal counsel of each party's own choosing; (2) there was fraud or coercion in obtaining the agreement; (3) all assets were fully disclosed by both parties before the agreement was executed; (4) each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce; (5) the terms of the agreement were fair and reasonable at the time of execution; and (6) the terms of the agreement are not unconscionable at the time of dissolution. Applying this standard to the postmarital agreement between David and Debra here, we find it enforceable and, therefore, reverse the decision of the district court and remand with directions to enforce it as written and agreed to by the parties.

## FACTS

David and Debra were married on June 25, 1976. They never had children. David has been a practicing attorney since 1981, while Debra's employment during the marriage was limited. Although she graduated from law school, Debra never sat for the bar exam or practiced law due to mental health issues and a traumatic brain injury she received in 1983 as the result of a car accident.

The parties signed two postmarital agreements after they were married, both of which were drafted by David. The first agreement, drafted sometime in the 1980's, provided that Debra would be entitled to all of the parties' assets in the event of a divorce. This agreement was either lost or misplaced. In 2004, David drafted a second postmarital agreement, which was similar if not identical to the distributive provisions set forth in the original agreement. The 2004 written agreement acknowledged David's role as scrivener and provided that Debra "does not have David's practical experience with drafting and enforcing agreements. For this reason, David has superior knowledge and understanding concerning the drafting of agreements such as this and Debra is relying on David's legal expertise and advice."

The written agreement also acknowledged that the parties had experienced problems and difficulties during the marriage but stated that the parties "currently have a valid marriage" and that neither party had "current plans [to] seek a dissolution of the marriage." In the event the marriage did fail, however, the agreement provided that David would receive his personal belongings and effects, including his clothing, tools, and guns, and Debra would receive all other assets including, but not limited to, the couple's home, vehicles, personal property, accounts, funds, stocks, bonds, investments, buildings, contracts, and leases. The agreement also required David to maintain a $1 million life insurance policy naming Debra as the sole beneficiary, even if the marriage ended in divorce.

On June 20, 2007, David filed for divorce and—notwithstanding the terms of both agreements he drafted and executed during the marriage—requested "an equitable division of the property and

debts." In response, Debra requested an award of spousal maintenance and asked the court to divide the property consistent with the 2004 postmarital agreement. Debra later moved for partial summary judgment, asking the district court to find that the postmarital agreement was valid and enforceable and that it controlled the disposition of any and all of the parties' real and personal property. Debra also requested attorney fees and costs, as contemplated by an indemnification provision in the postmarital agreement. In response to Debra's motion, David argued the district court was required to make a determination under K.S.A. 60-1610(b)(3) that the postmarital agreement was "valid, just and equitable" prior to its incorporation into a final divorce decree. To that end, David argued the postmarital agreement was invalid because it ran counter to public policy by promoting and encouraging divorce. David also argued that the agreement was neither just nor equitable in the distribution of assets.

Following argument, the district court found the postmarital agreement was drafted and executed in contemplation of divorce and, therefore, qualified as a separation agreement under K.S.A. 60-1610(b)(3), subject to review by the court to determine if it was valid, fair, and equitable. In order to make such a determination, the court scheduled an evidentiary hearing to identify and consider the value of the parties' assets that were subject to distribution under the postmarital agreement. After hearing the evidence, the court held the postmarital agreement was unjust and inequitable because enforcing it would result in a disproportionate share of the marital estate being distributed to Debra. In addition, the court held the postmarital agreement was invalid because it ran counter to public policy by promoting and encouraging divorce.

Having found the postmarital agreement to be inequitable and against public policy, the district court made its own decision on how to divide the parties' property pursuant to K.S.A. 60-1610(b)(1). In addition, the court awarded Debra spousal maintenance for 120 months but denied her request for attorney fees. Finally, the district court denied Debra's motion to alter or amend the judgment as it related to the postmarital agreement and attorney fees.

## Analysis

On appeal, Debra claims the district court erred (1) in finding the postmarital agreement in this case ran counter to public policy; (2) in relying on K.S.A. 60-1610(b)(3), which governs separation agreements, instead of general principles of contract to determine whether the postmarital agreement in this case was enforceable; and (3) in denying her request for attorney fees under the terms of the parties' postmarital agreement. We address each of Debra's claims in turn.

### 1. *The Postmarital Agreement Is Not Contrary to Public Policy*

Competent parties are free to make contracts on their own terms as long as the contracts are not contrary to public policy. *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 257, 225 P.3d 707 (2010). "A contract is against public policy if it is injurious to the interests of the public, contravenes some established societal interest, violates some public statute or tends to interfere with public welfare and safety." 2 Elrod and Buchele, Kansas Law and Practice: Kansas Family Law § 11.12, p. 95 (1999) (citing *Hunter v. American Rentals*, 189 Kan. 615, 618, 371 P.2d 131 [1962]). Relevant to the issue presented here, " '[p]ublic policy relating to marriage is to foster and protect it, to make it a permanent and public institution, to encourage the parties to live together and to prevent separation.' " *Ranney v. Ranney*, 219 Kan. 428, 431, 548 P.2d 734 (1976).

Based on these stated objectives, premarital and postmarital contracts between spouses generally are not contrary to public policy unless they encourage divorce or separation. *Matlock v. Matlock*, 223 Kan. 679, 683, 576 P.2d 629 (1978); *Ranney*, 219 Kan. at 431; see also Restatement (Second) of Contracts § 190 (1979) (marital agreements are unenforceable only if they operate to "change some essential incident of the marital relationship in a way detrimental to the public interest in the marriage relationship"). An agreement will be found to promote or encourage divorce if it obligates a spouse to procure a divorce, or obligates a spouse not to defend or contest a divorce. *In re Estate of Cooper*, 195 Kan. 174, 179-80, 403 P.2d 984 (1965). In the absence of terms or conditions that

serve to encourage divorce or separation, postmarital agreements are considered to be consistent with public policy in that they encourage the private resolution of family issues without resort to separation or divorce. See 2 Elrod and Buchele, Kansas Law and Practice: Kansas Family Law § 11.12, pp. 95-96. "By alleviating anxiety over uncertainty in the determination of legal rights and obligations upon dissolution, postnuptial agreements do not encourage or facilitate dissolution; in fact, they harmonize with our public policy favoring enduring marriages." *Bedrick v. Bedrick*, 300 Conn. 691, 698, 17 A.3d 17 (2011); see also 5 Williston on Contracts § 11:7 (4th ed. 2009) ("[S]eparation agreements, as well as other postnuptial and family settlement agreements, are generally favored by the courts as a peaceful means of terminating marital strife and discord as long as they are not contrary to statute or otherwise inimical to public policy.").

With these legal principles in mind, we turn to the postmarital agreement executed by David and Debra in this case. The district court held the agreement was contrary to society's long-standing public interest in fostering and protecting marriage in that it promoted and encouraged divorce. In so holding, the court focused on a specific stipulation between the parties where David and Debra agreed that, if the marriage did not survive, Debra was entitled to receive virtually all of the personal property acquired during the marriage through gift, inheritance, and joint effort of the parties. The court found this stipulation necessarily provided David with "a substantial incentive to file for divorce as soon as possible" because the sooner David filed for divorce, the sooner he would be able to acquire nonmarital assets for his retirement that would not be subject to distribution under the terms of the postmarital agreement. Based on its finding that the stipulation provided David with a substantial incentive to file for divorce, the court concluded, as a matter of law, that the stipulation promoted and encouraged divorce.

But the district court's factual finding—that the stipulation provided David with a substantial incentive to file for divorce—is belied by the factual record in this case. The parties signed a postmarital agreement in the 1980's that was similar, if not identical,

to the 2004 postmarital agreement at issue here; nevertheless, David did not file for divorce until decades later. Thus, David clearly did not believe the terms of the agreement provided him with a substantial incentive to file for divorce. And, although the parties signed the present agreement in 2004, David still did not file for divorce until 3 years later.

Moreover, the parties specifically and expressly represented and agreed at the time they executed the agreement that they intended to stay married and had no plans to divorce. The parties also acknowledged (in both the recitals and the body of the postmarital agreement) that Debra's parents either directly or indirectly provided "all or nearly all" of the existing marital assets owned by the parties and that any assets contributed to the marriage by David from his employment had been, and would be, used by the parties solely to maintain their lifestyle. Based on these circumstances, the parties clearly and unambiguously agreed that David would not receive any of the existing marital assets if the marriage did not survive. If the parties stayed married, however, both David and Debra would continue to benefit from existing marital assets, from prospective marital assets that might be provided by Debra's parents in the future, and from assets contributed to the marriage by David from his employment if the parties stayed married.

Based on our review of agreement, we find no evidence to support the district court's conclusion that its terms created a substantial incentive for David to file for divorce as soon as possible. With that said, the terms of the agreement do appear to support the inference drawn by the district court that the sooner David filed for divorce, the sooner he would be able to acquire nonmarital assets for his retirement that would not be subject to distribution under the terms of the postmarital agreement. Of course, it is highly likely that one or more provisions within any postmarital agreement will, to some extent, benefit one of the parties in the event of a divorce. But a finding that a postmarital agreement will benefit one of the parties if the marriage ultimately fails falls far short of a finding that the agreement actually encourages one or both of the parties to file for divorce. See *In re Estate of Cooper*, 195 Kan. at 179-80 (holding an agreement promotes or encourages

divorce if it obligates a spouse to procure a divorce or obligates a spouse not to defend or contest a divorce).

Finding no evidence to support the district court's legal conclusion that the agreement encourages David and Debra to separate or divorce, we hold the postmarital agreement is not contrary to the public's interest in protecting the institution of marriage.

*2. We Construe David and Debra's Marital Contract as a Postmarital Agreement Subject to a Standard for Enforceability Separate and Distinct from the Standard Used to Determine Enforceability of Separation Agreements*

Kansas statutes provide two options for defining and limiting the rights and obligations of parties who are entering into or dissolving a marriage. The Kansas Uniform Premarital Agreement Act (KUPAA) governs the law relating to premarital agreements executed by couples who are contemplating marriage. K.S.A. 2011 Supp. 23-2401 *et seq*. By statute, Kansas courts will not enforce such an agreement if it was involuntary or unconscionable when executed or signed without an adequate disclosure of assets. See K.S.A. 2011 Supp. 23-2407(a). On the opposite end of the spectrum, the Kansas statutory scheme controlling dissolution of marriage governs "separation agreements" executed by spouses who are contemplating divorce and have no intention of staying married. K.S.A. 60-1610(b)(3); see 2 Elrod & Buchele, Kansas Law and Practice: Kansas Family Law § 11.1, p. 93. Once a divorce action is filed in Kansas, the statute requires the court to incorporate the separation agreement into the divorce decree if it finds the agreement is valid, just, and equitable. K.S.A. 60-1610(b)(3).

We should note that we have cited to K.S.A. 60-1610, which was in effect when the parties executed their postmarital agreement and when David filed for divorce. The Kansas Legislature recodified the statutes for divorce cases effective July 1, 2011; see K.S.A. 2011 Supp. 23-2701 *et seq*.

In addition to the premarital and separation agreements, many jurisdictions recognize a third option for couples who want to define and limit the rights and obligations relating to marriage without court input: the postmarital agreement. Also referred to as a

marital or postnuptial agreement, the postmarital agreement is defined as an " 'agreement between spouses who plan to continue their marriage that alters or confirms the legal rights and obligations that would otherwise arise under . . . [the] law governing marital dissolution.' " *Ansin v. Craven-Ansin*, 457 Mass. 283, 284 n.1, 929 N.E. 2d 955 (2010) (quoting American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 7.01[1][b] [2002]). Based on this definition, the postmarital agreement is distinguishable from the separation agreement in that a postmarital agreement is a contract executed by spouses who want to preserve their marriage, and a separation agreement is a contract executed by spouses planning to end their marriage. See 2 Elrod and Buchele, Kansas Law and Practice: Kansas Family Law § 11.1, p. 93; *Bedrick*, 300 Conn. at 693 n.1 ("A postnuptial agreement is distinguishable from both a prenuptial agreement and a separation agreement."); *Ansin*, 457 Mass. at 289 ("A marital agreement stands on a different footing from both a premarital and a separation agreement.").

Contrast the unique position from which each agreement is negotiated and entered into: spouses who want to preserve their marriage do not contract under the same conditions as either prospective spouses or spouses who already have determined to dissolve their marriage. Parties who intend to marry are generally trusting, loyal, and looking forward to a successful and enduring marriage; yet the fact that they are not yet married necessarily provides the parties with greater leverage to reject an unsatisfactory premarital agreement. It makes sense, then, that the Kansas statute governing the premarital agreement requires the court to enforce it unless there is evidence that it was involuntary when made, unconscionable when executed, or negotiated without an adequate disclosure of assets. See K.S.A. 2011 Supp. 23-2407(a).

When the marriage has failed and the stated intention of the parties is divorce, the parties look to their own future economic interests and the resulting separation agreement likely will be the product of classic arm's-length bargaining. In this setting, the Kansas statute governing the separation agreement requires the court to incorporate it into the final divorce decree upon a finding that

it is "valid, just and equitable" at the time the divorce is granted. K.S.A. 60-1610(b)(3).

Unlike parties to a premarital agreement or a separation agreement, parties to a postmarital agreement have stated their intention to remain part of an existing marriage in which they already share a vested interest, personal intimacy, and mutual trust. The trusting and confidential nature of this existing relationship exposes the parties to a greater risk of unfair advantage in the bargaining process for two reasons. First, spouses who intend to stay married are unlikely to view the marital interest as distinct from their own interest. As a result, spouses to a postmarital agreement run the risk of putting the interests of the couple ahead of their own which, in turn, will make them less cautious than they would be if negotiating at arm's length with an ordinary contracting party. See *Bedrick*, 300 Conn. at 703. Second, spouses who intend to stay married run a greater risk of unfair advantage in the bargaining process because the spouse who has the stronger desire to preserve the marriage necessarily becomes more vulnerable to the financial demands of the other.

Given its unique characteristics, the postmarital agreement does not fall within the statutory definition of either a premarital agreement or a separation agreement in Kansas. The postmarital agreement does not qualify as a premarital agreement under the KUPAA statute because, by definition, the parties already were married when they executed the agreement. See K.S.A. 2011 Supp. 23-2402(a) (defining "premarital agreement" as an agreement between prospective spouses made in contemplation of marriage); *Davis v. Miller*, 269 Kan. 732, 738-40, 7 P.3d 1223 (2000) (holding Kansas statutes governing premarital agreements do not apply to postmarital agreements because the parties entering into a postmarital agreement are in a vastly different position than people entering into a premarital agreement). The postmarital agreement does not qualify as a separation agreement either. This is because the statute governing separation agreements is part of the Kansas statutory scheme controlling dissolution of marriage. Although none of these statutes define the term "separation agreement," one authority on Kansas family law has defined it as "a contract entered

into by a married couple in contemplation of annulment, separate maintenance or divorce." 2 Elrod & Buchele, Kansas Law and Practice: Kansas Family Law § 11.1, p. 93. Because the postmarital agreement is necessarily one made between spouses who plan to stay married, it cannot be construed as one executed under circumstances accompanying, connected with, or surrounding a contemplated separation or divorce.

We recognize that there is another situation that is not present in this case—instead of filing for divorce, parties can file for separate maintenance. In such cases, the court has authority to enter all the same orders it might make in a divorce case, but the court issues a decree of separate maintenance rather than a divorce decree. If parties entered into an agreement to determine their rights before filing for separate maintenance—but in contemplation of such a filing—the statute governing separation agreements presumably would apply. In such a case, the court can make all the same orders dividing property that it can make in a divorce action, and the parties have entered the agreement in contemplation of a separate-maintenance decree. In the case of David and Debra, however, their postmarital agreement was not entered in contemplation either of a divorce action or a separate-maintenance action. Instead, they planned to continue living together as married spouses, and they did so.

Based on the discussion above, we recognize the postmarital agreement as a legitimate marital contract in its own right that does not come within the statutory purview of either a premarital or a separation agreement. Accordingly, it is not governed by the terms of K.S.A. 2011 Supp. 23-2407(a) or K.S.A. 60-1610(b)(3). In the absence of an existing statute in Kansas that governs the legal standard of review for enforcing postmarital agreements, we must determine the proper standard for such a review. We begin by reviewing appellate court decisions in Kansas that may be relevant to such a determination.

Before the provision in K.S.A. 60-1601 governing separation agreements was enacted, Kansas courts liberally construed all postmarital agreements to carry out the intention of the parties and generally upheld them upon a finding that they were fairly and

understandably made, just and equitable in their provisions, and were not obtained by fraud and overreaching. See, *e.g.*, *In re Estate of Beeler,* 175 Kan. 190, 193, 262 P.2d 939 (1953); *In re Estate of Gustason,* 173 Kan. 619, 622, 250 P.2d 837 (1952); *Porter v. Axline,* 154 Kan. 87, 91, 114 P.2d 849 (1941); *Keller v. Keller,* 121 Kan. 520, 521, 247 P. 433 (1926). Nevertheless, because these standards were set forth in cases decided before K.S.A. 60-1610 was enacted, they do not otherwise distinguish between a separation agreement that is made in anticipation of divorce and a postmarital agreement that is entered into when the marriage is still sound.

In a case decided after K.S.A. 60-1610 became law, the Supreme Court determined a postmarital agreement should be reviewed for enforceability under the standards set forth in the KUPAA applicable to premarital agreements. The court's decision, however, was prompted solely by the fact that the parties specifically agreed in the document itself that the standards governing premarital agreements in Kansas would control its enforceability. *Davis,* 269 Kan. at 738-40.

More recently, a panel of our court concluded in an unpublished opinion that any agreement between spouses presented for judicial approval in a divorce action should be construed as a separation agreement under K.S.A. 60-1610(b)(3), regardless of whether the parties' intention was to stay married or divorce at the time the agreement was executed. *In re Marriage of Wood,* No. 97,123, 2007 WL 3146693, at *4 (Kan. App. 2007) (unpublished opinion), *rev. denied* 286 Kan. 1178 (2008). In fact, the district court in the case currently before us relied on the decision in *Wood* to justify construing David and Debra's postmarital agreement here as a separation agreement. But we already have concluded as a matter of law that it would be improper to determine the enforceability of a postmarital agreement pursuant to existing Kansas statutes that govern the law relating to premarital agreements and separation agreements. Thus, our decision today directly conflicts with the decision reached in *Wood.* See *State v. Urban,* 291 Kan. 214, 223, 239 P.3d 837 (2010). (Kansas Court of Appeals are not bound by prior rulings of another panel.). "While we must carefully consider each precedent cited to us, we also must uphold our duty to cor-

rectly determine the law in each case that comes before us. In doing so, we sometimes find that we must respectfully disagree with the opinion of another panel." *Uhlmann v. Richardson*, 48 Kan. App. 2d 1, 13, 287 P.3d 287 (2012). To that end, we respectfully disagree with the panel's decision in *Wood*, which concluded that an agreement executed by spouses who planned to continue their marriage should nonetheless remain subject to the statute governing separation agreements in divorce cases, K.S.A. 60-1610.

In sum, we conclude that neither the Kansas Legislature nor the courts in Kansas have embraced a standard for enforceability of a spousal agreement that properly distinguishes between a separation agreement executed by spouses who intend to divorce and a postmarital agreement executed by spouses who intend to stay married. Given the need for such a standard, we look to other jurisdictions for guidance.

Some jurisdictions treat postmarital agreements under the same standards as premarital agreements. See, *e.g.*, *Tibbs v. Anderson*, 580 So. 2d 1337, 1339 (Ala. 1991) ("[B]ecause the same concerns regarding the existence of undue influence or advantage by the dominant spouse in obtaining a waiver exist both before and after the marriage, we follow the same line of reasoning used in determining the validity of *prenuptial waivers*."); *Lipic v. Lipic*, 103 S.W. 3d 144, 149 (Mo. App. 2003) (similarities surrounding policy concerns justify employing premarital agreement standards of enforceability to postmarital agreements); *Stoner v. Stoner*, 572 Pa. 665, 672 n.5, 819 A.2d 529 (2003) ("[T]he principles applicable to antenuptial agreements are equally applicable to postnuptial agreements."); see also American Law Institute, Principles of the Law of Family Dissolution § 7.01, comment b. Under § 6 of the Uniform Premarital Agreement Act (UPAA), 9C U.L.A. 48-49 (2001), a premarital agreement is unenforceable when: (1) the challenger did not enter the agreement voluntarily, or (2) the agreement was unconscionable when executed and, prior to execution of the agreement, the challenger (a) did not receive a fair and reasonable disclosure of the other party's assets and liabilities; (b) did not voluntarily and expressly waive, in writing, any right to disclosure beyond that provided; and (c) did not have, or reasonably could not

have had, adequate knowledge of the other party's assets and liabilities.

Other jurisdictions go beyond the standards imposed by premarital agreements and subject postmarital agreements to greater scrutiny. See, *e.g.*, *Bedrick*, 300 Conn. at 703 ("postnuptial agreements require stricter scrutiny than prenuptial agreements"); *Ansin*, 457 Mass. at 290 n.8 (applying greater scrutiny to postmarital agreement because "the principles applicable to premarital and marital agreements are not the same in all respects"); *Pacelli v. Pacelli*, 319 N.J. Super. 185, 196, 725 A.2d 56 (1999) (rejecting use of UPAA to judge validity of postmarital agreements). These jurisdictions require greater scrutiny based on the fact that spouses stand in a confidential relationship with each other and the agreements are "executed when the parties do not contemplate divorce and when they owe absolute fidelity to each other." *Ansin*, 457 Mass. at 297; see 2 Hunter, Modern Law of Contracts § 24:14 (2011) (Because of the fiduciary relationship between spouses, agreements between them "must meet the high standards of fiduciary trust, which means that there must be full disclosure and fair dealing.").

Due to perceived risks of unfair advantage and of unequal bargaining positions that are unique to the postmarital agreement, the Massachusetts Supreme Court in *Ansin* set forth certain factors a spouse seeking to enforce a postmarital agreement must satisfy. Drawing heavily on the work of the American Law Institute, the court held that judges must carefully scrutinize this type of agreement to determine whether

"(1) each party has had an opportunity to obtain separate legal counsel of each party's own choosing; (2) there was fraud or coercion in obtaining the agreement; (3) all assets were fully disclosed by both parties before the agreement was executed; (4) each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce; and (5) the terms of the agreement are fair and reasonable at the time of execution and at the time of divorce." *Ansin*, 457 Mass. at 291 (citing ALI, Principles of the Law of Family Dissolution § 7.01 *et seq.*).

Thus, in addition to the usual protections against fraud and coercion, the *Ansin* court stressed the need for opportunity to obtain

separate legal counsel, for full financial disclosure before execution, for a knowing and voluntary waiver of rights, and for fair and reasonable terms both at execution and at enforcement. With regard to fairness and reasonableness, the court noted that a "judge is not required to 'divine' what judgment [he or] she would likely enter had the case been litigated in the absence of an agreement. Rather, [he or] she considers only whether the agreement is 'fair and reasonable' when considered in light of the factors we have identified and any other relevant circumstances." *Ansin*, 457 Mass. at 299. Applying its newly created legal framework to the facts presented, the *Ansin* court ultimately enforced the agreement executed by the parties.

In *Bedrick*, the Connecticut Supreme Court looked to the *Ansin* factors for guidance but ultimately decided to use one standard for judging fairness at the time of execution and a different standard for judging fairness at the time of enforcement. See *Bedrick*, 300 Conn. at 703-04 ("[A] court may enforce a postnuptial agreement only if it complies with applicable contract principles, and the terms of the agreement are both fair and equitable at the time of execution *and not unconscionable* at the time of dissolution." [Emphasis added.]). The court made clear in its decision that mere unfairness or inequality at the time of dissolution is not enough to render the agreement unenforceable; instead, the court must look to the impact that the terms of the agreement will have on the parties. The standard to determine whether enforcement of an agreement will be unconscionable "is analogous to determining whether enforcement of an agreement would work an injustice." 300 Conn. at 706. The court added that "[u]nforeseen changes in the relationship, such as having a child, loss of employment or moving to another state, may render enforcement of the agreement unconscionable." 300 Conn. at 706. Given the dramatic change in the parties' economic circumstances since the agreement had been executed, the *Bedrick* court ultimately found the agreement unconscionable at the time the husband sought to enforce it. 300 Conn. at 708.

Our review of the analysis conducted by other jurisdictions provides a good framework for our own analysis. But the contractual

nature of a postmarital agreement necessarily means that our ultimate determination regarding the proper standard in Kansas for enforceability of that agreement must·be consistent with Kansas law pertaining to contracts. Kansas courts long have held that competent parties may make contracts on their own terms and fashion their own remedies where they are not illegal, contrary to public policy, or obtained by fraud, mistake, overreaching, or duress. *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 327, 582 P.2d 1111 (1978). Relevant here, the freedom to contract in Kansas was critical to the decision reached by our Supreme Court in *Davis*. In *Davis*, the court confirmed the legality of a provision in the postmarital agreement where the parties stipulated that the KUPAA would govern its enforceability of the agreement instead of K.S.A. 60-1610(b), notwithstanding the fact that the KUPAA statute expressly states that it was not enacted to apply to postmarital agreements. *Davis*, 269 Kan. at 738-40.

Notably, an exception to the freedom of contract principle is recognized in Kansas when a contract is so one-sided that it is found to be unconscionable. *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 757, 549 P.2d 903 (1976). "A doctrine of unconscionability is used to deny enforcement of unfair or oppressive contracts because of procedural abuses arising out of the contract formation or because of substantive abuses relating to terms of the contract." *Adams v. John Deere Co.*, 13 Kan. App. 2d 489, 492, 774 P.2d 355 (1989). In order to be unconscionable, a contract must be so outrageous and unfair in its wording or its application that it shocks the conscience or offends the sensibilities of the court. 13 Kan. App. 2d at 492. In addition, there must be some element of deceptive bargaining conduct present as well as unequal bargaining power. *State ex rel. Stovall v. ConfiMed.com*, 272 Kan. 1313, 1321, 38 P.3d 707 (2002).

Based on the discussion above, we conclude the appropriate standard for assessing the enforceability of a postmarital agreement necessarily must be guided by two overriding principles: (1) public policy in Kansas that promotes, fosters and protects the institution of marriage by encouraging spouses to live together and preventing separation; and (2) well-established principles· of contract law in

Kansas endorsing the right of its citizens to negotiate and enforce their own contracts without government interference in the absence of fraud, mistake, duress, or terms so shocking that the court deems them unconscionable. The courts in *Bedrick* and *Ansin* provided a helpful list of factors that should be considered, but the *Bedrick* court's refinement of the *Ansin* factors is consistent with Kansas law. While *Ansin*, 457 Mass. at 289, authorized a court to void the parties' contractual agreement if it was, in the court's view, no longer "fair and reasonable" at the time of making and at the divorce, *Bedrick* gives a court such authority only if the agreement was unfair at the time of making or unconscionable at the time of divorce. 300 Conn. at 703-04. *Bedrick* is thus more consistent with the emphasis of Kansas law in granting greater freedom of contract to the parties.

Based on these principles, we hold the appropriate standard for assessing the enforceability of a postmarital agreement is review of the agreement by the court to determine whether (1) each party had an opportunity to obtain separate legal counsel of each party's own choosing; (2) there was fraud or coercion in obtaining the agreement; (3) all material assets were fully disclosed by both parties before the agreement was executed; (4) each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce; (5) the terms of the agreement were fair and reasonable at the time of execution; and (6) the terms of the agreement are not unconscionable at the time of dissolution. Having determined the appropriate standard, we are ready to review David and Debra's postmarital agreement to determine whether the agreement is enforceable. Although the district court did not have an opportunity to evaluate the agreement under this standard, remand is unnecessary because the record contains sufficient factual information for us to reach a decision. See *Newman Mem. Hospital v. Walton Constr. Co.*, 37 Kan. App. 2d 46, 72, 149 P.3d 525, *rev. denied* 284 Kan. 946 (2007).

a. *Opportunity to Obtain Legal Counsel*

Representation by counsel is an important factor in determining whether a spouse voluntarily enters into an agreement. See *Davis*,

269 Kan. at 741. Although representation by counsel is not required for an agreement to be enforceable, *access* to independent counsel is "crucial for a party waiving important legal rights." See Uniform Premarital and Marital Agreement Act § 9, Comment (October 1, 2012).

Here, it is not clear whether Debra had the opportunity or desire to obtain independent legal counsel prior to signing the postmarital agreement. But it would be difficult for David, as the spouse seeking to invalidate the agreement, to argue that he did not have the opportunity to consult with independent counsel regarding the waiver of his rights. There is no dispute here that David is a lawyer and that he is the individual who drafted the agreement. In fact, the agreement itself states that "David has superior knowledge and understanding concerning the drafting of agreements such as this" and Debra is "relying on David's legal expertise and advice."

b. *Fraud and Coercion*

"[W]here a party voluntarily signs a postmarital contract and thereafter seeks to refute it on the ground its execution was obtained by fraud, such fraud must be made to appear clearly before the contract may be declared invalid." *In re Estate of Beeler*, 175 Kan. at 194. We note, as a preliminary matter, that David does not contend that the agreement was the product of fraud or coercion. And even if he had, there is nothing in the record to support such a conclusion.

"The elements of an action for fraud include an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party justifiably relies and acts to his or her detriment. [Citation omitted.]" *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191 (2004). There is no evidence of fraud here.

Coercion comes into play when improper pressure by one party to a contract deprives another party of the exercise of his or her free will and causes him or her to act to his or her detriment. *Hastain v. Greenbaum*, 205 Kan. 475, 482, 470 P.2d 741 (1970). Unlike fraud, coercion does not require an act of deceit. The determinative factor in a coercion claim is whether the pressured

party executed the contract voluntarily. In determining whether a party to a premarital agreement entered into it voluntarily, our Supreme Court engaged in the following analysis:

" 'To determine if the agreement was voluntary, the court will focus on the surrounding facts and circumstances. These include the situation of the parties as compared to each other, such as their respective ages, educational backgrounds, business experience, property, family ties and connections. Additionally the court will look at the circumstances leading up to the execution of the contract and marriage, such as timing of the presentation and execution of the agreement, who drafted the agreement, provisions for the dependent spouse, statements made by the party wanting the agreement, if there was independent legal counsel, and who was present at the execution of the agreement. Absent a showing of undue influence or fraud, the agreement will be upheld.' 1 Elrod and Buchele, Kansas Family Law § 2.24, pp. 99-100." *Davis*, 269 Kan. at 741.

There is no dispute here that David is a lawyer and that he is the individual who drafted the agreement. The agreement itself states that "David has superior knowledge and understanding concerning the drafting of agreements such as this and Debra is relying on David's legal expertise and advice." The agreement further provides that both Debra and David were entering into the agreement "freely, voluntarily and with full understanding of all of its provisions" and that each of them had read the agreement and understood the rights, obligations, and legal consequences arising out of it. Although the provisions relating to property division greatly favored Debra and the agreement was, at least partly, executed in consideration for Debra's agreement not to obtain a divorce at various times throughout the marriage, there is no evidence that David executed the agreement against his will.

### c. *Disclosure of Assets*

Parties disclosing assets in a premarital context need not provide an exact dollar amount as long as there is a general knowledge of the nature and extent of the property involved. *Davis*, 269 Kan. at 743; see, *e.g.*, *In re Marriage of Adams*, 240 Kan. 315, 320, 729 P.2d 1151 (1986) (adequate disclosure where wife was "advised generally of the nature and extent" of husband's assets, knew he was a multimillionaire, and had known him more than 20 years before signing agreement); *In re Estate of Schippel*, 169 Kan. 151,

165, 218 P.2d 192 (1950) (husband need not give detailed disclosure of his assets where wife has "general understanding" of nature and extent of his property).

But disclosure of assets in a mid-marital environment is unlike a disclosure in a premarital environment in that a confidential fiduciary relationship already has been established and currently exists between spouses. As such, the parties should be required to disclose more than just a general overview of the nature and extent of the property held. Although—like a premarital agreement—the parties disclosing assets in a postmarital context should not be required to provide an exact dollar amount, a postmarital agreement generally should be enforced only if the parties have a reasonably accurate understanding of the monetary value attached to material assets held jointly or separately by the other party.

The relevant portion of the postmarital agreement in this case provided:

"The Parties each agree that they are both aware of the full extent of the Assets of the [Parties] and expressly waive any right to further disclosure of the property or financial obligations of the other party. The Parties each acknowledge that he or she has given full consideration to the Assets, liabilities and income of the other and that he or she is entering into this Agreement freely, voluntarily and with full understanding of all of its provisions."

David does not argue, and the evidence does not suggest, that Debra hid any material assets from David or provided David with misinformation as to the value of any material assets. Moreover, David agreed in writing that he was fairly apprised of the nature and extent of the property and interests awarded to Debra under the agreement, and he waived his right to any further disclosure of Debra's assets. Under these circumstances, we find the disclosure of assets sufficient.

### d. *Waiver of Judicial Equitable Division of Assets*

Waiver as it relates to a postmarital agreement is important because it emphasizes a party's exercise of a meaningful choice to give up certain rights. In determining whether a party meaningfully waived his or her right to a judicial division of assets, the *Ansin* court held that a judge should consider " 'whether each party was

represented by independent counsel, the adequacy of the time to review the agreement, the parties' understanding of the terms of the agreement and their effect, and a party's understanding of his or her rights in the absence of an agreement.' " *Ansin v. Craven-Ansin*, 457 Mass. 283, 296, 929 N.E.2d 955 (2010).

The terms of the agreement in this case readily establish that David knew he was entitled to have the court divide the marital assets in the event of divorce but—for a myriad of reasons expressly stated in the agreement itself—he wanted to relinquish that right. Again, David drafted the agreement himself, which necessarily precludes any argument that David lacked adequate time to review the agreement or that he did not understand its terms. The terms of the agreement itself state that David understood the rights, obligations, and legal consequences arising out of it. Finally, the fact that David was a practicing attorney is strong evidence that David knew he was entitled to have the court divide the marital assets in the event of divorce.

### e. *Fair and Reasonable Terms When Executed*

Next, we turn to the requirement that a postmarital agreement contain terms that are "fair and reasonable" at the time of execution. In analyzing Debra and David's agreement under this factor, we are mindful of the rule that the terms of written instruments generally are construed against the scrivener. See *T.R. Inc. of Ashland v. Brandon*, 32 Kan. App. 2d 649, 654, 87 P.3d 331. (2004).

With regard to this "fair and reasonable when executed" requirement, the *Ansin* court afforded

"greater latitude for agreements reached where each party is represented by separate counsel of their own choosing. [Citation omitted.] A judge may consider 'the magnitude of the disparity between the outcome under the agreement and the outcome under otherwise prevailing legal principles,' whether 'the purpose of the agreement was to benefit or protect the interests of third parties (such as the children from a prior relationship),' and 'the impact of the agreement's enforcement upon the children of the parties.' [Citation omitted.] Other factors may include the length of the marriage, the motives of the contracting spouses, their respective bargaining positions, the circumstances giving rise to the marital agreement, the degree of the pressure, if any, experienced by the contesting spouse, and other circumstances the judge finds relevant." 457 Mass. at 297.

In this case, the parties had been married approximately 28 years. Although property division under the agreement was not an even split, the agreement explained that Debra would receive a substantial portion of the parties' assets in the event of a voluntary dissolution of the marriage because nearly all of the parties' assets had been contributed by Debra's parents and because Debra would have a limited ability to obtain gainful employment and no social security benefits. Conversely, David practiced law in association with one of the largest and most prestigious law firms in Kansas and had a steady stream of income for the foreseeable future. Despite the disparity in property division between the parties, the agreement specifically acknowledged that its terms were fair and reasonable, that David voluntarily entered into the agreement, and that he had received full disclosure of Debra's property and assets. Under these circumstances, we find David and Debra's agreement was fair and reasonable at the time it was executed.

### f. *Unconscionable at Dissolution*

Whether an agreement is unconscionable involves a question of law and is to be determined based on the facts and circumstances of each case. See *Davis v. Miller*, 269 Kan. 732, 742-43, 7 P.3d 1223 (2000). In the context of a premarital agreement, our Supreme Court in *Davis* relied on the following comment to the UPAA to determine whether such an agreement was unconscionable at the time of divorce:

" 'The test of "unconscionability" is drawn from Section 306 of the Uniform Marriage and Divorce Act (UMDA) [citations omitted.] The following discussion set forth in the Commissioner's Note to Section 306 of the UMDA is equally appropriate here:

"Subsection (b) undergirds the freedom allowed the parties by making clear that the terms of the agreement respecting maintenance and property disposition are binding upon the court unless those terms are found to be unconscionable. The standard of unconscionability is used in commercial law, where its meaning includes protection against one-sidedness, oppression, or unfair surprise [citations omitted], and in contract law [citations omitted]. It has been used in cases respecting divorce settlements or awards. [Citations omitted.] Hence the act does not introduce a novel standard unknown to the law. In the context of negotiations between spouses as to the financial incidents of their marriage, the standard includes protection against overreaching, concealment of assets, and sharp dealing

not consistent with the obligations of marital partners to deal fairly with each other.

"In order to determine whether the agreement is unconscionable, the court may look to the economic circumstances of the parties resulting from the agreement, and any other relevant evidence such as the conditions under which the agreement was made, including the knowledge of the other party. If the court finds the agreement not unconscionable, its terms respecting property division and maintenance may not be altered by the court at the hearing.' " *Davis*, 269 Kan. at 742-43 (quoting ULA Comment to § 6 of the UPAA, 9B U.L.A. 376-77).

The postmarital agreement in this case provides Debra with a substantial amount of the parties' assets. However, inequality alone does not render a postmarital agreement unfair and/or unreasonable, as there is no requirement in Kansas that joint marital property be divided equally. *In re Marriage of Vandenberg*, 43 Kan. App. 2d 697, 715, 229 P.3d 1187 (2010) (Although the ultimate division of property must be just and reasonable, it need not be equal.); see *In re Marriage of Brane*, 21 Kan. App. 2d 778, 783, 908 P.2d 625 (1995). Debra received more under the agreement, in part, because her age and disability would make it difficult for her to obtain gainful employment following a divorce. Moreover, the agreement readily acknowledged the unequal distribution of assets and explained the parties intended to do so because of the significant gifts and loans Debra's family had provided to them during the marriage. Further support for the parties' intentions may be found in the contract for will that the parties executed at the same time as the postmarital agreement, which was also written by David. The contract for will provided for a similar distribution of assets as the postmarital agreement, and states in pertinent part:

"Whereas, to Don and Pat Concannon [Debra's parents], family is and was everything and it is and was their desire for their wealth, accumulated through considerable hard work, sacrifice and struggle, to remain in the Concannon family. Because of David's great love and respect for both Don and Pat, his respect for their hard work, his understanding of their desire to have their own children and grandchildren benefit from their efforts, as well as his deep and abiding appreciation and gratitude for both Don's and Pat's support of David and Debra in both material and non-material ways and because of the opportunities that both Don and Pat have given David to grow and achieve much more than he could have ever anticipated, David desires to honor Don's and Pat's desires to [provide] for their own family and to return to them or their issue the assets which were

given to David and Debra as well as the accumulation of assets made possible by their generosity, their teaching, and the opportunities they have given Debra and David."

Notably, the postmarital agreement stated that Debra had disclosed its existence to her father. Thereafter, Debra's family continued to provide gifts to Debra and David with the knowledge that these gifts would remain with Debra in the event of dissolution of their marriage. Although David accepted all the benefits of these gifts, he now seeks to modify that same agreement to avoid its disadvantages. "A party may not accept the benefits of a judgment and reject its burdens. [Citation omitted.]" *Drummond v. Drummond*, 209 Kan. 86, 92, 495 P.2d 994 (1972).

We conclude from the facts and circumstances before us—including David's role as the scrivener of the agreement, Debra's reliance on David's expertise and knowledge in drafting the agreement, the substantial assets contributed to the marriage by Debra's family, Debra's mental disability and corresponding needs, Debra's inability to earn income and acquire capital assets in the future, David's profession, David's opportunity to earn income and acquire capital assets in the future, the absence of alimony for Debra in the agreement—that the postmarital agreement is neither outrageous and unfair in its wording nor in its application and thus does not shock the conscience or offend the sensibilities of this court. See *Adams*, 13 Kan. App. 2d at 492 (defining an unconscionable provision in a contract as one that is so outrageous and unfair in its wording or its application that it shocks the conscience or offends the sensibilities of the court).

3. *Debra Is Entitled to Attorney Fees Under the Indemnity Provision*

As a final point, we must address Debra's argument that she is entitled to attorney fees pursuant to the indemnity provision in the postmarital agreement, which provides:

"**Indemnification.** Each of The Parties agrees to refrain from attempting to obtain any court order or decision that is contrary to the terms of this Agreement. Each of the Parties hereby agrees to indemnify the other for any loss, cost or expense (including attorney fees and expenses) incurred because a Party seeks to obtain judicial modification of this Agreement. This indemnification on behalf of

each party shall be binding upon and include any claims, demands, or litigation filed by the legal or personal representatives, executors, heirs, legatees, devisees or beneficiaries of either party."

A court may not award attorney fees absent statutory authority or an agreement by the parties. *Unruh v. Purina Mills*, 289 Kan. 1185, 1200, 221 P.3d 1130 (2009). Where the district court has authority to grant attorney fees, its decision is reviewed under an abuse of discretion standard. An abuse of discretion occurs if the discretion is guided by an erroneous legal conclusion. *Farrar v. Mobil Oil Corp.*, 43 Kan. App. 2d 871, 876-77, 234 P.3d 19, *rev. denied* 291 Kan. 910 (2010).

In rejecting Debra's request for attorney fees, the district court stated:

"No attorney fees are granted against David and in favor of Debra. In making this decision the court considered that the property award of the parties greatly favors Debra and that Debra has been provided Spousal maintenance for 120 months. To award Debra an additional amount for attorney fees would not be fair, just and equitable and would warrant a reconsideration of the award of spousal maintenance and property. David's actions in this case were consistent in directing the court to follow the law. Finally a substantial contributor to the significant attorney fees incurred by Debra and the delay in getting this matter to the court was due to Debra and her mental illness."

Debra claims that she is entitled to an award of attorney fees because David sought "to obtain judicial modification" of the postmarital agreement, contrary to the terms of the indemnity provision.

David's request for an equitable division of property in the divorce, including his argument that the postmarital agreement was unenforceable, was a clear attempt to obtain judicial modification of the agreement. In light of our holding that the postmarital agreement is enforceable and is not contrary to public policy, the indemnity provision contemplating attorney fees must also be enforced against David.

## CONCLUSION

The district court erred in construing the present agreement as a separation agreement and reviewing it for fairness under K.S.A. 60-1610(b)(3). The agreement is an enforceable postmarital agree-

ment that is not contrary to public policy. We therefore remand this case to the district court with directions to divide the parties' assets consistent with the terms of the postmarital agreement and to enter an attorney fee award in favor of Debra.

Reversed and remanded with directions.