***FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER***

Electronically Filed
Supreme Court
SCWC-11-0001074
11-AUG-2014
02:15 PM

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

SANDRA C.J. BALOGH, Respondent/Plaintiff-Appellant,

vs.

DONALD RAYMOND BALOGH, Petitioner/Defendant-Appellee.

SCWC-11-0001074

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-11-0001074; FC-D NO. 10-1-0149)

AUGUST 11, 2014

AMENDED CONCURRING AND DISSENTING OPINION BY POLLACK, J.

## I. Background

In the period leading up to the signing of the "agreements" at issue in this case, Sandra Balogh's (Sandra) and Donald Balogh's (Ray) marriage was deteriorating. "There was constant shouting and screaming. It was an ugly situation with

no communication between the parties."[1]  Id.  Ray was under heavy stress as he was unable to control his exhibitionist behavior even though he knew it was wrong.[2]  Ray was also out of work at the time of the signing of the "agreements" in October 2008, having just retired a few months earlier.

After months of arguments, Sandra told Ray "if he were serious about being committed to the marriage, then they should 'write something up.'"  On October 6, 2008, Sandra dictated to Ray the terms of an "agreement" to save their marriage, which Ray handwrote on a single sheet of blank paper (October 6 Document).  The October 6 Document provided that if the couple separated, Sandra would receive 75% of the proceeds from the sale of the couple's residence, the entire contents of the house

---

[1]  The quoted statements are from the findings of facts (FOF) of the family court and were not contested on appeal.  Sandra challenged only two of the family court's FOF.  First, Sandra challenged FOF 48, in which the family court determined that on August 15, 2009, Sandra told Ray he should leave, and Ray reluctantly agreed.  Second, Sandra challenged FOF 53, which credited Ray's explanation for the Quitclaim deed: "After discussions with Sandra, Ray thought the Quitclaim Deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when thing[s] returned to normal."  The majority concluded that this finding was not clearly erroneous, and therefore binding on this court.  Majority at 25.

All of the family court's remaining FOF are binding on this court.  See Bremer v. Weeks, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004) ("findings of fact that are not challenged on appeal are binding on the appellate court" (quotation marks, brackets, and ellipsis omitted)).

Sandra challenged Conclusions of Law N, O, P, Q, R, and S.

[2]  Exhibitionism, which involves exposing one's genitals to an unsuspecting person, falls under the psychiatric sexual disorders category of paraphilias, "any intense and persistent sexual interest other than . . . with . . . consenting human partners."  See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 685, 689 (5th ed. 2013) available at http://dsm.psychiatryonline.org/content.aspx?bookid= 556&sectionid=41101785, http://dsm.psychiatryonline.org/content.aspx?bookid= 556&sectionid=41101785#103442356.

excluding Ray's tools and clothes, and the couple's vehicles. "Ray believed that if he did not sign the note, he would lose his wife of 30 years and everything they had worked for together." Ray "was not in his right mind" when he signed the October 6 Document. The express terms of the handwritten "agreement" provided no consideration for Ray's relinquishment of half of his interest in their home.[3] The family court found that when Sandra signed the October 6 Document, she "was not thinking about divorce, she took Ray's signing as a show of his commitment to the marriage."

Less than three weeks after the October 6 Document had been signed, Sandra and Ray signed a second "agreement," entitled "Memo of Understanding" (MOU). During this two-week interval, there was no change in Ray's emotional state. Indeed, the family court's uncontested finding was that "[t]he parties signed the MOU with the intent that they would work on the marriage, especially Ray. Sandra believed Ray would tell her the truth and stop his inappropriate behavior by signing the MOU. Ray signed it in his desperate attempt to hold the marriage together." The MOU provided that in the event of a divorce, in addition to Sandra receiving the 75% share of the property, contents of the home, and vehicles, Ray was required

---

[3]     The fair market value of the residential property was 1.6 million dollars.

to give Sandra $100,000.00 "in lieu of Alimony and court proceedings." There was no consideration stated in the MOU for the additional property that Sandra would receive in the event of a divorce.

By August 2009, the marriage had reached its breaking point. Ray admitted to Sandra that he was continuing to expose himself, and he "reluctantly agreed to move" after Sandra told him that "he should leave."[4] Before leaving, Ray called his relatives, and during the call, Sandra overheard Ray say to his sister "maybe divorce." As a result of overhearing this comment, "Sandra got upset and demanded [Ray] sign over the house as security." Sandra wanted Ray to work on the marriage, and Ray agreed to sign a quitclaim deed both to protect the asset and to show further commitment to the marriage. As "security," Ray and Sandra executed a deed dated September 1, 2009, purporting to transfer 100% interest in the property to Sandra (Quitclaim Deed). Sandra conceded in her brief to the ICA that the Quitclaim Deed was one-sided. Sandra believed Ray signed the Quitclaim Deed because he was serious about saving the marriage.

Ray stated that he was "not in his right mind when [he] signed these documents." It is uncontested that "[e]ach

_____

[4] As noted, see supra note 1, Sandra contested the family court's finding in FOF 48 that she told Ray that he should leave.

time, Ray believed he could salvage the marriage by signing these agreements.  <u>He would have signed anything to save their thirty-year marriage.  He was in a panic</u>."  (Emphasis added).  The family court found that Ray also believed the Quitclaim Deed was only a temporary agreement that would protect the home from potential lawsuits, and the title would eventually transfer back to joint ownership.[5]

The family court concluded that Ray and Sandra

> were motivated to save their marriage when they signed the various agreements.  When Ray signed the Quitclaim Deed, Ray was protecting their marital home from potential lawsuits and had no intent of permanently transferring his interest to Sandra.  Neither party intended their marriage to result in a divorce and to divide their marital estate accordingly.

Not surprisingly, based upon these uncontroverted facts, the family court concluded that all three "agreements" were not enforceable based upon the combined influence of numerous stressors that were affecting Ray when the "agreements" were signed.  The family court concluded that "Ray was suffering from extreme distress" due to: (1) the ongoing construction of the Kahala Kua residence; (2) the contractor's walk-off and lawsuit in 2006; (3) the penalties assessed by the couple's homeowner's association, Association of Owners of Kahala Kua aka

---

[5]     As noted, <u>see</u> <u>supra</u> note 1, Sandra contested the family court's finding in FOF 53 that "[a]fter discussions with Sandra, Ray thought the Quitclaim Deed would protect the home from potential lawsuits, but title would be transferred back to joint ownership when thing[s] returned to normal."

Kahala Kua Community Association (AOAO) and the parties' lawsuit against the AOAO; (4) his high security clearance job that also required twenty-four hour/seven days on call one week a month; (5) the continuing issues with the subcontractors; (6) his uncontrollable obsessive behavior that escalated from his backyard nudity to public display; (7) his shame and embarrassment; (8) his fear of being discovered; and (9) the constant argument with Sandra about his inappropriate behavior. The tenth reason stated by the family court was that while all of the other circumstances were occurring, Sandra suspected Ray of infidelity, which further exacerbated the marital relationship and escalated the tension and the friction in their home. Accordingly, the family court concluded that "Ray was thus under duress and coercion when he signed the agreements."

The family court also concluded that "[a]fter 30 years of marriage . . . it would be unconscionable to award Sandra the [home] by enforcing the Quitclaim Deed." The family court based its conclusion of unconscionability on its finding that Ray "would in essence receive 0% of the marital estate if" the agreements were enforced.[6]

---

[6] As noted, see supra note 1, Sandra contested the foregoing conclusion of law (COL) of the family court, except that Sandra did not challenge the conclusion that Ray would "in essence" receive 0% of the marital property if the home were awarded to Sandra, in COL M.

In vacating the family court's detailed findings and analysis, the majority's decision to uphold the MOU implies that a contract between spouses in a deteriorating marriage should be evaluated as if the partners were engaging in arm's length negotiations, without appropriate consideration of the vulnerabilities and unequal power inherent in a breakdown of a marriage. By applying a standard used to evaluate contracts in a commercial context and requiring Ray to show specific evidence of an "improper threat" and the absence of a "reasonable alternative" to prove involuntary assent to a contract between marital partners, the majority's decision unduly constricts the law. Moreover, by not acknowledging the emotional nature of a marriage and its effects on "bargaining" between the spouses, the decision creates a precedent that permits an emotionally stronger spouse to take advantage of a more vulnerable one.

## II.  Discussion

I would affirm the family court's determination that the Quitclaim Deed was unconscionable and therefore unenforceable.[7]  Based on the determination that the Quitclaim Deed was unenforceable as unconscionable, I would not reach the

---

[7]  I concur with the ultimate result of the majority's holding that the "quitclaim deed did not bar the family court from equitably dividing [Ray and Sandra's] property," Majority at 26, inasmuch as that holding renders the Quitclaim Deed as essentially without legal effect, although I would find the Quitclaim Deed unenforceable because of unconscionability.  I dissent as to the majority's treatment of the remaining two "agreements."

majority's conclusion that that Quitclaim Deed did not alter the division of property. Majority at 23-24.

I would also uphold the family court's implicit conclusion that Ray's assent to the October 6 Document and the MOU was involuntary. The family court's conclusion that the agreements were unenforceable is sustained by the family court's detailed FOFs that were largely uncontested on appeal and firmly supported by the record. These uncontested facts provide multiple bases to support the family court's determination that Ray's assent to the October 6 Document and the MOU was involuntary. Further, in line with the approach taken by many other states, I would hold that spouses are fiduciaries of each other, and therefore contracts between spouses that affect the division of property in the event of a divorce should be evaluated under that standard. Alternatively, I would hold that, as a threshold matter, the October 6 Document and the MOU are void for lack of consideration.

## A. The Quitclaim Deed is unconscionable

A postmarital or separation agreement is enforceable if it is not unconscionable and has been voluntarily entered into by the parties with knowledge of the financial situation of the other spouse. See Lewis v. Lewis, 69 Haw. 497, 500-01, 748 P.2d 1362, 1366 (1988).

> Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the

> parties together with contract terms which are unreasonably favorable to the other party. Whether a meaningful choice is present in a particular case can only be determined by consideration of all the circumstances surrounding the transaction.

Siopes v. Kaiser Found. Health Plan, Inc., 130 Hawai'i 437, 458, 312 P.3d 869, 890 (2013) (quoting City & Cnty. of Honolulu v. Midkiff, 62 Haw. 411, 418, 616 P.2d 213, 218 (1980)). Unconscionability typically encompasses two principles: one-sidedness and unfair surprise. Lewis, 69 Haw. at 502, 748 P.2d at 1366. In the context of postmarital agreements, however, one-sidedness alone can render an agreement unconscionable and therefore unenforceable. See Kuroda v. Kuroda, 87 Hawai'i 419, 428, 958 P.2d 541, 550 (App. 1998); Majority at 29-30.

Here, it is the uncontested COL of the family court that Ray "would in essence receive 0% of the marital estate if Sandra is awarded [the home]." Furthermore, Sandra acknowledged that enforcing the Quitclaim Deed "would be 'one-sided' . . . ." It is hard to envision an agreement that is more one-sided than an agreement that gives one spouse 100% of the marital estate and the other spouse 0%. The family court correctly concluded that:

> It would be unconscionable to award Sandra the [home] by enforcing the Quitclaim Deed. Kuroda v. Kuroda, 87 Hawai'i 419, 958 P.2d 547 (App. 1998); Lewis v. Lewis, 69 Haw. 497, 748 P.2d 1362 (1988).

Therefore, the finding of the family court should be affirmed.

**B.    The "agreements" are unenforceable because Ray's assent was involuntary.**

Although the family court concluded that Ray was "under duress and coercion when he signed the agreements," the majority determines that Ray's assent was "voluntary" because the family court's findings are not sufficient to support duress.  Majority at 35-36.  According to the majority, duress cannot be shown because: (1) the trial court did not make specific findings that Sandra had improperly threatened Ray; and (2) Ray could not show that he had no reasonable alternative to signing the MOU.  In so concluding, the majority errs by incorrectly restricting its involuntariness inquiry to duress.

**1.    The correct Hawai'i standard for the enforceability of postmarital agreements**

A postmarital agreement is not enforceable if it is entered into involuntarily.  "When a premarital agreement setting forth support and property division in the event of divorce is not unconscionable and has been voluntarily entered into by the parties with knowledge of the financial situation of the prospective spouse, enforcement of the agreement does not violate the principle of a 'just and equitable' award under [Hawai'i Revised Statutes (HRS)] § 580-47."[8]  Lewis, 69 Haw. at

_____

[8]    At the time the "agreements" in this case were signed, this statute provided, in relevant part:

(continued. . .)

500-01, 748 P.2d at 1366.  "Involuntariness is shown by evidence of 'duress, coercion, undue influence, <u>or any other circumstance indicating lack of free will or voluntariness.'</u>"  <u>Chen v. Hoeflinger</u>, 127 Hawai'i 346, 357, 279 P.3d 11, 22 (App. 2012) (emphasis added) (quoting <u>Prell v. Silverstein</u>, 114 Hawai'i 286, 298, 162 P.3d 2, 14 (App. 2007)).  Therefore, under Hawaii's controlling legal standard for the enforceability of postmarital contracts, involuntariness may be shown not only by duress, but also by coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness.

> **2.  The family court found that Ray's assent was involuntary.**

After listing ten contributing factors to Ray's stress, as noted above, Conclusion of Law (COL) P determined that:[9]

---

(. . .continued)
> Upon granting a divorce . . . the court may make any further orders as shall appear just and equitable . . . finally dividing and distributing the estate of the parties, real, personal, or mixed, whether community, joint, or separate[.]

HRS § 580-47 (1997).  This language was identical at the time of <u>Lewis</u>. HRS § 580-47 (Supps. 1969, 1986).

[9]    Although COL P is set out as a conclusion of law, "the trial court's label is not determinative of the standard of review."  <u>Crosby v. State Dep't of Budget & Fin.</u>, 76 Hawai'i 332, 340, 876 P.2d 1300, 1308 (1994). A circuit court's FOF are reviewed on appeal under the "clearly erroneous" standard whereas its COL are not binding upon an appellate court and are usually reviewed under the right/wrong standard.  <u>Estate of Klink ex rel. Klink v. State</u>, 113 Hawai'i 332, 351, 152 P.3d 504, 523 (2007).

(continued. . .)

> Ray was thus under <u>duress and coercion</u> when he signed the agreements. <u>Prell v. Silverstein</u>, 114 Haw. 286, 162 P.3d 2 (Haw. App. 2007).

(Emphasis added). While the family court referred to "duress and coercion" without using the word "involuntary," its specific citation to <u>Prell</u> makes it plain that the family court intended "duress and coercion" to convey involuntariness.[10] This is manifest because <u>Prell</u> defines duress and coercion as sufficient to demonstrate involuntariness, but not as the exclusive method of doing so. In the context of evaluating a premarital agreement, <u>Prell</u> states: "[n]o evidence was adduced that [spouse] signed the premarital agreement under duress, coercion, undue influence, or any other circumstance indicating lack of free will or voluntariness." 114 Hawaiʻi at 298, 162 P.3d at 14. That is, <u>Prell</u> references "duress" as one "circumstance" of several "indicating [a] lack of free will or voluntariness." <u>Id.</u>

---

(. . .continued)

A COL that "is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned." <u>Id.</u> (brackets omitted). "However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." <u>Id.</u>

In other words, because the family court's COL P is a "determination that embraces an ultimate fact[,]" it "is a factual finding subject to the clearly erroneous standard of review even though classified as a COL." <u>Crosby</u>, 76 Hawaiʻi at 340, 874 P.2d at 1308.

[10] This same test is utilized by the majority in its analysis. <u>See</u> Majority at 35.

Thus, by describing the totality of the circumstances, including Ray's uncontrollable behavior, extreme stress, fear of being discovered, and the escalating tension in the relationship, then concluding that Ray was under duress and coercion, and then citing to Prell, the family court implicitly found that Ray's assent to the agreements was involuntary. To conclude otherwise infers that the family court, despite citing the controlling authority that sets forth the standard for voluntariness in postmarital contracts, did not understand and apply the law that it cited.[11]

Voluntariness is a question of fact. See State v. Price, 55 Haw. 442, 443, 521 P.2d 376, 377 (1974) (in the context of a search, holding that voluntariness is a question of fact). The family court was in the best position to make factual findings. In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) ("[I]t is well-settled that an appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact.")).

---

[11] Assuming arguendo that COL P is ambiguous as to whether the family court intended "duress and coercion" to mean involuntariness, then the case should be remanded to the family court for clarification. "'Because . . . findings [of fact] are imperative for an adequate judicial review of a lower court's conclusions of law,' we have held 'that cases will be remanded when the factual basis of the lower court's ruling cannot be determined from the record.'" State v. Hutch, 75 Haw. 307, 331, 861 P.2d 11, 23 (1993) (quoting State v. Anderson, 67 Haw. 513, 514, 693 P.2d 1029, 1030 (1985)).

13

A family court's FOF are reviewed under the "clearly erroneous" standard. In re Doe, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003). A FOF is only "clearly erroneous" when "(1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made."[12] Id. Therefore, it is improper for this court to disregard the family court's findings of fact regarding voluntariness if the findings of the family court are supported by substantial evidence.

3. **Substantial evidence supports finding that Ray's assent was involuntary**

The family court's uncontested FOFs support a conclusion that Ray's assent to the "agreements" was involuntary.[13] First, as noted above and set forth in COL P, the family court found that among the multiple factors contributing to the coercion and duress that led to Ray's involuntary assent

_____

[12] Substantial evidence is credible evidence of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. In re Doe, 101 Hawai'i at 227, 65 P.3d at 174.

[13] The "agreements" should be examined together for several reasons. First, the circumstances under which the "agreements" were executed were virtually identical. The October 6, 2008 agreement and the MOU were signed within three weeks of each other, during which time the tension between Ray and Sandra was high and had not dissipated. As noted above, "Each time, Ray believed he could salvage the marriage by signing these agreements. He would have signed anything." Second, the subject matter of the agreements is also the same, providing essentially the same triggering event, i.e. separation or divorce. Finally, three of the four provisions of the MOU are the same as the three provisions of the October 6 Document. Therefore, all the "agreements" should be considered together when evaluating the voluntariness of Ray's assent.

14

were: his exhibitionist behavior and the associated repercussions from that behavior, including the letters from the AOAO, confrontations with the police at Makapu'u, and being banned from Ala Moana; the litigation and construction problems associated with the home; and his "high security clearance job."

Second, the facts demonstrate that Ray's mental state was extremely vulnerable. The family court described Ray as "unable to control his inappropriate behavior"; "extremely embarrassed but still unable to control his impulses"; and "distraught that he had no control over and did not know what to do about his inappropriate behavior. He "felt his brain was fried"; "fearful of his behavior being made" public; "not in his right mind"; "desperate"; and "in a panic." Following the first two "agreements," Ray's exhibitionist behavior escalated, including two letters from the homeowners' association; an incident at Makapu'u Trail; and an incident at Ala Moana. These findings of fact are uncontested. Therefore, Ray's mental state was plainly vulnerable, increasing the likelihood that duress or undue influence was instrumental in gaining his assent and reducing the likelihood that his assent to the agreements was voluntary.[14]

_____

[14] The majority notes Ray's education, degrees, and high-level security clearance as an indication that Ray was aware of what he was doing. Majority at 41. However, Ray never asserted that he was not aware; instead his contention is that his stress and efforts to preserve his marriage

(continued. . .)

Third, Sandra was drafting the "agreements."  Sandra dictated the October 6 Document to Ray.  Sandra also prepared the MOU, which added the $100,000 payment to her in the event of a divorce.  Therefore, in light of Sandra having drafted the "agreements," the likelihood that Ray's assent to the "agreements" was involuntary was increased.

Fourth, the uncontested facts are that Ray felt he had no choice but to sign the "agreements."  As to the October 6 Document, "Ray believed if he did not sign this note, he would lose his wife of thirty years and everything they had worked for together."  As to the MOU, "Ray signed it in his desperate attempt to hold the marriage together."  As to all three "agreements," "each time, Ray believed he could salvage the marriage by signing these agreements.  He would have signed anything to save their thirty-year marriage.  He was in a panic."

Thus, there is substantial evidence in the record indicating that Ray's assent to the three "agreements" was induced by circumstances indicating a lack of free will or

_____

(. . .continued)
indicated a lack of free will.  The majority also notes that Ray "expressly testified that he agreed to all the terms of the MOU."  Id.  Again, Ray never denied agreeing to the terms of the "agreements."  The issue was whether his assent was voluntary under the circumstances.

voluntariness.[15]  Accordingly, the family court's implicit finding that Ray's assent was involuntary was not clearly erroneous and should be upheld.

4.    **"Other circumstances" indicates that Ray's assent was involuntary**

Involuntariness in postmarital contracts may be shown by evidence of "any other circumstance indicating lack of free will or voluntariness."  Chen, 127 Hawai'i at 357, 279 P.3d at 22; Prell, 114 Hawai'i at 298, 162 P.3d at 14.  Because "other circumstances" is broadly inclusive, it is similar to a totality of the circumstances rule, under which a court's "inquiry will not be unfairly limited."  Maguire v. Hilton Hotels Corp., 79 Hawai'i 110, 117, 899 P.2d 393, 400 (1995) (defining totality of the circumstances as a part of determining, in a tort action, the foreseeability of a criminal act committed by a third party).  A totality of the circumstances "inquiry is broad enough to examine other factors as well."  Id.  Other states

---

[15]    The majority suggests that because Ray waived the defense of lack of capacity, he also waived the defense of involuntariness.  Majority at 40.  However, involuntariness is distinct from a defense of lack of capacity.  See Grace M. Giesel, A Realistic Proposal for the Contract Duress Doctrine, 107 W. Va. L. Rev. 443, 448 (2005) ("Situations of limited decisional capacity or flawed decisional capacity are not duress and should be irrelevant to duress.").  Incapacity to contract means that the person was "incapable of understanding the nature and effect of the transaction at the time the instrument was executed."  Pontes v. Pontes, 40 Haw. 620, 623 (Haw. Terr. 1954).  See also 5 Williston on Contract § 10:3 (4th ed.) (Mental incompetence renders transactions voidable); Restatement (Second) of Contracts § 15 (1981).  Consequently, a capacity to enter into contracts does not invalidate an involuntariness defense.  Ray never waived the issue of whether his assent was voluntary.

have used a totality of circumstances approach in assessing the enforceability of postmarital agreements.

For example, in Pacelli v. Paccelli, 725 A.2d 56 (N.J. Super. Ct. App. Div. 1999), the New Jersey Superior Court closely scrutinized and carefully evaluated a "mid-marriage"[16] agreement because it left the husband, a sophisticated businessman, and wife, a much younger, uneducated immigrant, in disparate financial situations. Id. at 62. After ten years of marriage and two children, the husband informed the wife that he would divorce her unless she agreed to certain terms regarding their economic relationship. Id. at 58. The wife's overriding concern was preserving her family—"she would [have] sign[ed] anything[.]" Id. (emphasis added).

> Thus, [the wife] faced a more difficult choice than the bride who is presented with a demand for a pre-nuptial agreement. The cost to [the wife] would have been the destruction of a family and the stigma of a failed marriage. She testified on several occasions that she signed the agreement to preserve the family and to make sure that her sons were raised in an intact family.
>
> [The wife's] access to eminent counsel is of little relevance because her decision was dictated not by a consideration of her legal rights, but by her desire to preserve the family.

Id. at 59. Based on these circumstances, the court found that the context in which the husband made his demand was "inherently coercive" because the wife's decision "was dictated not by a

---

[16] A "mid-marriage" agreement is the same as a "postmarital" agreement in the context of these cases as both occur after the date of marriage but prior to a final divorce.

consideration of her legal rights, but by her desire to preserve the family." Id. Therefore, the Pacelli court looked to the totality of the circumstances in reaching its determination that the postmarital agreement was unenforceable. Id. at 63.

In In re Marriage of Baltins, 212 Cal. App. 3d 66 (Cal. Ct. App. 1989), a California appeals court examined the totality of the circumstances in finding that the husband intentionally used coercion to induce the wife's consent to an unconscionable contract. Id. at 87. The court found that the wife was "effectively" deprived of independent counsel, in a distraught and weakened condition emotionally, and had no reasonable alternative. The husband had undermined the wife psychologically by repeatedly telling her she had not contributed as much as he did to the marriage and was not an equal partner; he had made threats and misrepresentations; and he pressured the wife into taking immediate action. Id. Therefore, the Baltins court looked at the totality of the circumstances to find the husband had intentionally used duress to induce the wife's consent to the agreements. Id.

Other states have used a series of factors to measure the enforceability of postmarital agreements. For instance, Kansas courts have looked to whether:

> (1) each party had an opportunity to obtain separate legal counsel of each party's own choosing; (2) there was fraud or coercion in obtaining the agreement; (3) all material assets were fully disclosed by both parties before the

19

> agreement was executed; (4) each spouse knowingly and explicitly agreed in writing to waive the right to a judicial equitable division of assets and all marital rights in the event of a divorce; (5) the terms of the agreement were fair and reasonable at the time of execution; and (6) the terms of the agreement are not unconscionable at the time of dissolution.

In re Marriage Traster, 291 P.3d 494, 507 (2012). See also Ansin v. Craven-Ansin, 929 N.E.2d 955, 963-64 (2010) (using the first five factors to measure enforceability but not unconscionability).

In the application of the totality of circumstances and factor-based analyses, courts are not arbitrarily limited to a single test when analyzing postmarital contracts for involuntariness, but look to all the relevant conditions in a given case. Similarly, under the Chen/Prell standard, involuntariness can be found by evaluating "any other circumstance indicating lack of free will or voluntariness." Chen, 127 Hawai'i at 357, 279 P.3d at 22; Prell, 114 Hawai'i at 298, 162 P.3d at 14. Therefore, a court's analysis of the enforceability of postmarital contracts should not be "unfairly limited" and should be "broad enough to examine other factors." Maguire, 79 Hawai'i at 117, 899 P.2d at 400.

In the present case, the other circumstances specified in the uncontested findings firmly support the determination that Ray's assent to the "agreements" was involuntary. Like Pacelli, Ray's motivation was not preserving

20

financial assets, but at saving the emotional relationship at any cost. Further, both the Pacelli court and the family court found that the vulnerable spouse would have signed "anything." See Pacelli, 725 A.2d at 58. Similar to Baltins, Sandra pressured Ray into immediate action, and, as discussed, Ray believed he had no other choice. 212 Cal. App. 3d at 87. Ray was in a distraught and weakened emotional state and did not have the opportunity to consult with independent counsel, again similar to the wife in Baltins. Id.

Additionally, at least three of the six Traster factors were also present. First, Ray did not obtain separate legal counsel before signing the "agreements." Second, Ray did not knowingly and explicitly agree in writing to waive the right to a judicial equitable division of material assets and all marital rights in the event of a divorce. Third, the terms of the agreement were not fair and reasonable at the time of execution.

Therefore, construing Prell's "any other circumstances" element as not "unfairly limit[ing]" and broad enough to examine other factors, would result in the same conclusion as the family court: that the "agreements" were involuntary and thus unenforceable.

5. **The record demonstrates Ray's assent was unduly influenced**

Under Chen and Prell, an agreement may also be involuntary if it is the result of undue influence.[17] Chen, 127 Hawai'i at 357, 279 P.3d at 22; Prell, 114 Hawai'i at 298, 162 P.3d at 14. Undue influence is defined as the improper use of power or trust in a way that deprives a person of free will and substitutes another's objective. Cvitanovich-Dubie v. Dubie, 125 Hawai'i 128, 160, 254 P.3d 439, 471 (2011). It is

> the misuse of a position of confidence or the taking advantage of a person's weakness, infirmity or distress to change improperly that person's actions or decisions. While it is impossible to define or describe with precision and exactness what is undue influence, it matters that the quality and the extent of the power of one mind over another must be to make it undue. Thus, false representations, or misrepresentations of law or fact, are not essential to a showing of undue influence, for a person's will may be overborne without false representation.

Cvitanovich-Dubie, 125 Hawai'i at 160-61, 254 P.3d at 471-72 (emphasis added) (citations, brackets and quotation marks omitted). Undue influence is "coercive in nature, persuasion which overcomes the will without convincing the judgment." Odorizzi v. Bloomfield Sch. Dist., 246 Cal. App. 2d 123, 130 (1966) (cited approvingly in Cvitanovich-Dubie, 125 Hawai'i at 160-61, 254 P.3d at 471-72). Therefore, the critical elements

---

[17] The majority notes that the family court did not make an express finding of undue influence. Majority at 41. However, undue influence is an enumerated "circumstance indicating lack of free will or involuntariness." Chen, 127 Hawai'i at 357, 279 P.3d at 22. As the family court's finding of "duress and coercion" was an implicit finding of involuntariness, undue influence was encompassed within the court's findings.

of undue influence are (1) the abuse of a position of confidence or taking advantage of a person's weakness, in order to (2) improperly change that person's actions or decisions; actual fraud is not necessary. Cvitanovich-Dubie, 125 Hawai'i at 160-61, 254 P.3d at 471-72.

As a spouse, Sandra was in a position of confidence in regards to Ray and it was an abuse of that confidence to influence her spouse to sign over significant property in order to demonstrate his commitment to the marriage. Furthermore, Ray's actions were improperly changed by Sandra; that is, he would not have promised her half of his interest in the house, all of the vehicles and contents of the house, and $100,000 in lieu of court proceedings, except for Sandra having told Ray "if he were serious about being committed to the marriage, then they should 'write something up.'" None of the facts found by the family court suggest that Ray was convinced the "agreements" were in good judgment; rather, it is unchallenged that "[e]ach time, Ray believed he could salvage the marriage by signing these agreements. He would have signed anything to save their thirty year marriage." (Emphasis added). Thus, Ray would not have signed over his share of the home in the "agreements" and the additional monetary payments to Sandra if it had not been on Sandra's insistence that he do so in order to demonstrate his commitment to save the marriage.

There is substantial evidence that Sandra's actions took advantage of her position as Ray's wife of 30 years and Ray's troubled emotional state in order to induce Ray to sign the "agreements." There is no indication that Ray would have otherwise spontaneously gifted essentially 100% of the marital estate to Sandra. Therefore, Sandra unduly influenced Ray's assent to the "agreements", and Ray's assent to the "agreements" is indicative of a lack of free will or voluntariness. Thus, the family court's implicit conclusion that Ray's assent was involuntary should be affirmed.

**C.  Measuring involuntariness through a fiduciary relationship between spouses**

The confidential relationship between spouses should require contracts to be subjected to a fiduciary standard to protect spouses against self-dealing and overreaching by the more dominant spouse. "Unlike parties to a premarital agreement or a separation agreement, parties to a postmarital agreement have stated their intention to remain part of an existing marriage in which they already share a vested interest, personal intimacy, and mutual trust." Traster, 291 P.3d at 503. In Traster, the Kansas Court of Appeals explained that the "trusting and confidential nature of this existing relationship exposes the parties to a greater risk of unfair advantage in the bargaining process for two reasons":

> First, spouses who intend to stay married are unlikely to view the marital interest as distinct from their own interest. As a result, spouses to a postmarital agreement run the risk of putting the interests of the couple ahead of their own which, in turn, will make them less cautious than they would be if negotiating at arm's length with an ordinary contracting party. Second, spouses who intend to stay married run a greater risk of unfair advantage in the bargaining process because <u>the spouse who has the stronger desire to preserve the marriage necessarily becomes more vulnerable to the financial demands of the other</u>.

<u>Id.</u> at 503 (emphasis added) (citation omitted). Therefore, <u>Traster</u> recognized two concerns: (1) spouses who wish to stay married are likely to put the marriage ahead of their individual interest; and (2) such spouses may be exploited because their commitment to the marriage will lead them to make greater financial sacrifices to preserve the relationship. Because of these concerns, the voluntariness of postmarital agreements should be evaluated with closer scrutiny.

Sixteen states and Puerto Rico impose greater burdens on postnuptial agreements than they impose on prenuptial agreements. Sean Hannon Williams, <u>Postnuptial Agreements</u>, 2007 Wis. L. Rev. 827, 838 (2007). The state courts and legislatures that have imposed additional procedural and substantive burdens on postnuptial agreements recognize that postmarital agreements "increase the potential for fraud and deception, often leaving the spouse with less economic leverage (usually the wife) with no choice but to sign an agreement presented by the wealthier spouse (usually the husband)," as opposed to premarital agreements. <u>Id.</u> at 830 (parentheticals in original).

Other jurisdictions have required review under a fiduciary standard, based on the fact that spouses stand in a confidential relationship with each other, and postmarital agreements are "executed when the parties do not contemplate divorce and when they owe <u>absolute fidelity</u> to each other." <u>Ansin</u>, 929 N.E.2d at 968 (emphasis added). See <u>In re Estate of Wilber</u>, 75 A.3d 1096, 1101 (N.H. 2013) ("spouses are traditionally regarded as fiduciaries of one another"); <u>Tremont v. Tremont</u>, 827 N.Y.S.2d 309, 311 (2006) ("courts carefully scrutinize marital agreements based on the fiduciary relationship of the parties"); <u>Dawbarn v. Dawbarn</u>, 625 S.E.2d 186, 191 (N.C. Ct. App. 2006) ("The relationship between a husband and wife creates a fiduciary duty."); <u>Marsh v. Marsh</u>, 949 S.W.2d 734, 739 n.4 (Tex. App. 1997) ("in post-marital agreements a fiduciary duty exists that is not present in premarital agreements between prospective spouses"); <u>In re Marriage of Bonds</u>, 5 P.3d 815, 831 (Cal. 2000) ("persons, once they are married, are in a fiduciary relationship to one another").

A fiduciary duty between spouses means that agreements between them "must meet the high standards of fiduciary trust, which means that there must be full disclosure and fair dealing." Howard O. Hunter, <u>Modern Law of Contracts</u> § 2:24 (2014). Courts holding spouses to a fiduciary standard require

"the highest degree of good faith, candor and sincerity in all matters bearing on the terms and execution of the proposed agreement, with fairness being the ultimate measure." Wilber, 75 A.3d at 1101 (emphasis omitted). "Because of the confidential relationship between a husband and a wife, courts have imposed the same duties of good faith and fair dealing on spouses as required of partners and other fiduciaries." Daniel v. Daniel, 779 S.W.2d 110, 115 (Tex. App. 1989). "When an interspousal transaction advantages one spouse, the law . . . presumes such transactions to have been induced by undue influence. Courts of equity view gifts and contracts which are made or take place between parties occupying confidential relations with a jealous eye." In re Marriage of Haines, 33 Cal. App. 4th 277, 293-94 (1995) (citations, brackets, ellipsis, and quotation marks removed). For example, based on concerns over the uneven power dynamics in a mid-marriage context, California appellate courts have instituted a presumption of duress when considering the enforceability of postmarital agreements. Bonds, 5 P.3d at 831. "Whenever [married persons] enter into an agreement in which one party gains an advantage, the advantaged party bears the burden of demonstrating that the agreement was not obtained through undue influence." Id. (emphasis added).

In keeping with the twin concerns expressed by Traster that spouses who wish to stay married are likely to put the marriage ahead of their individual interest and that such spouses may be exploited, transactions between spouses should be subject to the general rules governing fiduciary relationships, which guide the actions of persons occupying confidential relations with each other.  See Cal. Fam. Code § 721 (2002).[18] This requirement would impose a duty of good faith and fair dealing on each spouse, such that neither could take an unfair advantage of the other.  The confidential relationship and

---

[18]    The California code provide the following definition of a fiduciary relationship between spouses:

> [I]n transactions between themselves, a husband and wife are subject to the general rules governing fiduciary relationships which control the actions of persons occupying confidential relations with each other.  This confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other.  This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners . . . including, but not limited to, the following:
>
> (1) Providing each spouse access at all times to any books kept regarding a transaction for the purposes of inspection and copying.
>
> (2) Rendering upon request, true and full information of all things affecting any transaction which concerns the community property.  Nothing in this section is intended to impose a duty for either spouse to keep detailed books and records of community property transactions.
>
> (3) Accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse which concerns the community property.

Cal. Fam. Code § 721 (2003).

fiduciary relationship would be subject to the same rights and duties of non-marital business partners.

I would hold that an agreement that was not in accordance with fiduciary standards should be presumptively involuntary and unenforceable, and such agreements would be enforceable only if the defending spouse could demonstrate that the agreements in question were executed under a fiduciary standard of good faith and fair dealing. Given Ray's extreme mental distress and vulnerable state of mind described by the uncontested findings of the family court and the financial advantage gained by Sandra, the record before this court is clear that the agreements between Sandra and Ray do not meet the highest fair dealing standard of fiduciary trust, and the agreements are therefore presumptively involuntary and unenforceable.

## D. The October 6 "agreement" and MOU are invalid and unenforceable for lack of consideration

As an alternative basis for affirming the judgment of the family court, I would examine the threshold issue of whether the October 6 Document and MOU were supported by consideration sufficient to form a contract. Ray raised the defense of lack of consideration as a defense at trial. The family court's declination to make a determination as to lack of consideration was plain error, under the standards adopted by this court.

> In civil cases, the plain error rule is only invoked when
> "justice so requires."  We have taken three factors into
> account in deciding whether our discretionary power to
> notice plain error ought to be exercised in civil cases:
> (1) whether consideration of the issue not raised at trial
> requires additional facts; (2) whether its resolution will
> affect the integrity of the trial court's findings of fact;
> and (3) whether the issue is of great public import.

U.S. Bank Nat'l Ass'n v. Castro, 131 Hawai'i 28, 42, 313 P.3d

717, 731 (2013) (emphases added) (quoting Montalvo v. Lapez, 77

Hawai'i 282, 290, 884 P.2d 345, 353 (1994)).  Here, with respect

to the first two factors, no additional facts must be considered

to determine the issue and finding a lack of consideration will

not affect the integrity of the family court's FOFs.  As to the

final factor, the adequacy of consideration in postmarital

agreements is of great public import because upholding such

contracts without true bargained-for exchange does not allow the

family court to exercise its authority to effect "just and

equitable" distributions of the marital estate.  See HRS § 580-

47 ("the [family] court may make any further orders as shall

appear just and equitable . . . finally dividing and

distributing the estate of the parties"); Gussin v. Gussin, 73

Haw. 470, 478, 836 P.2d 484, 488-89 (1992) (noting the wide

discretion conferred upon the family court by HRS § 580-47);

Lewis, 69 Haw. at 500-01, 748 P.2d at 1366 (holding that

premarital agreements are enforceable when they do not violate

the principle of a "just and equitable" award under HRS § 580–

47). Therefore, invoking plain error is appropriate in this case.

### 1. Consideration in postmarital contracts

All contracts made between spouses, not otherwise invalid because of any other law, are valid. HRS § 572-22 (1987). However, the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange <u>and</u> consideration. Restatement (Second) of Contracts § 17 (1981) (emphasis added). This court has stated that "[a] compromise, like any other contractual agreement, must be supported by consideration." <u>Sylvester v. Animal Emergency Clinic of Oahu</u>, 72 Haw. 560, 567, 825 P.2d 1053, 1057 (1992). Therefore, consideration is a threshold issue in determining whether a contract exists.

"It is well-settled that consideration is an essential element of, and is necessary to the enforceability or validity of, a contract." <u>Douglass v. Pflueger Haw., Inc.</u>, 110 Hawai'i 520, 534, 135 P.3d 129, 143 (2006) (quoting <u>Shanghai Inv. Co., Inc. v. Alteka Co., Ltd.</u>, 92 Hawai'i 482, 496, 993 P.2d 516, 530 (2000), <u>overruled on other grounds by</u> <u>Blair v. Ing</u>, 96 Hawai'i 327, 31 P.3d 184 (2001)). To constitute consideration, a performance or a return promise must be bargained for. Restatement (Second) of Contracts § 71 (1981). Consideration may take many forms; it is well established that "[f]orbearance

to exercise a right is good consideration for a promise."
Shannon v. Waterhouse, 58 Haw. 4, 7, 563 P.2d 391, 393 (1977).

Although the family court did not address the issue of the lack of consideration, the determination of lack of consideration is a question of law for the court to decide, reviewable de novo.  Stern v. Stern, 243 A.2d 319, 320 (Pa. 1968); Colligan v. Smith, 366 S.W.2d 816, 818 (Tex. App. 1963); Farmers Union Oil Co. of New England v. Maixner, 376 N.W.2d 43, 48 n.2 (N.D. 1985).  This court has not examined what constitutes consideration for a postnuptial contract between spouses.  Other courts have held that neither the marriage itself, nor continuation of the marriage, can act as sufficient consideration for a postnuptial agreement because past consideration cannot support a current promise.  See Bratton v. Bratton, 136 S.W.3d 595, 600 (Tenn. 2004); Whitmore v. Whitmore, 778 N.Y.S.2d 73, 75 (2004).[19]

In Bratton, a husband signed a letter in which he promised "never to be the cause of a divorce."  Bratton, 136 S.W.3d at 597.  In the event that he broke the promise, he promised to give to the wife "50% of my present belongings and 50% of my net future earnings."  Id.  The Supreme Court of

_____

[19]  But cf. Zagari v. Zagari, 746 N.Y.S.2d 235, 238 (2002) (declining to find lack of consideration in a post marital agreement where the agreement recited consideration and the spouse seeking to invalidate the agreement offered no proof on the issue of consideration).

Tennessee found that a promise to stay in a marriage is not consideration.

> Ms. Bratton's promise not to leave her husband <u>is clearly not consideration for the agreement</u>. Both parties' admitted that they were not having marital difficulties at the time the agreement was signed. <u>Therefore, this was not a reconciliation agreement where separation or divorce was imminent</u>, making the wife's promise to remain in the marriage a meaningful act.

<u>Id.</u> at 603 (emphases added). Similarly, in <u>Whitmore</u>, 16 years before actually divorcing, the husband and wife executed a document entitled "Marital Agreement" in which the wife "waived her right to any business property owned by the husband, regardless whether it was acquired before or after the marriage." <u>Whitmore</u>, 778 N.Y.S.2d at 74. The court found that:

> Here, the wife received no consideration for signing the postnuptial agreement. <u>The postnuptial agreement does not recite any consideration, and does not contain any mutual promises</u>. Although the wife released her claims on the husband's business property, he did not relinquish any rights to any of her property or give the wife anything in return. <u>The husband claims that his continuing to remain married to the wife provided adequate consideration</u>. <u>We disagree</u>.

<u>Id.</u> at 75 (emphases added). Therefore, when there is no actual intent or contemplation of divorce, postmarital contracts, in which one spouse promises to relinquish significant property rights in the event of divorce, and the other side only promises to remain in the marriage or to not get divorced, are void for lack of consideration.

## 2.   The "agreements" lack consideration

Here, it is not clear as to what was the bargained-for exchange that would support the existence of a contract in the first two agreements.[20]  The October 6 Document provided that in the event of a separation, Ray would give up half of his interest in the couple's home worth approximately $1.6 million, plus the contents of the home (except his clothes and tools), plus any interest in the couple's vehicles.  In the MOU, Ray additionally agreed to pay $100,000 in lieu of alimony and court proceedings.  Therefore, Ray's promise in the first two "agreements" is clear; in the event of a divorce or separation, he would relinquish or pay significant property to Sandra.

However, it is not clear what constituted Sandra's return performance or promise.  The documents themselves do not recite an exchange of promises.  Intuitively, it would seem that Sandra's return "promise" was forbearance of her right to divorce Ray.  However, divorce was not on Sandra's mind—it is the uncontested findings of the family court that "Sandra was not thinking about a divorce; she took Ray's signing [of the October 6 Document] as a show of his commitment"; "[t]he parties signed the MOU with the intent that they would work on the marriage"; "Sandra believed Ray signed the Quitclaim Deed

---

[20]   The Quitclaim Deed contained its own recitation of consideration.

because he was serious about saving the marriage." (Emphases added). The family court found "that the parties were motivated to save the marriage when they signed the various agreements . . . . Neither party intended their marriage to result in a divorce and to divide their marital estate accordingly." Even after overhearing Ray say "maybe divorce" to his sister, Sandra still "wanted Ray to work on the marriage[.]" As it is the uncontested findings of the family court that when Sandra signed the first two agreements she did not intend to divorce Ray, Sandra's return promise could not have been to forbear from acting on her legal right to divorce Ray.

At oral argument, counsel for Sandra characterized the consideration for the October 6 "agreement" as the exchange of mutual promises: "You promise to work hard on the marriage, and I promise to work hard on the marriage, and if this thing doesn't work, this promise for promise, then this is how we're going to divide our assets."[21] When pressed on the issue of consideration for the subsequent agreements, counsel conceded, "We really didn't delve into what the consideration was . . . We really didn't delve into that."[22] Moreover, a promise to work hard or stay in the marriage would not serve as consideration

---

[21] MP3: Oral Argument, Hawai'i Supreme Court, at 31:40 (Mar. 4, 2013), http:// www.courts.state.hi.us/courts/oral_arguments/archive/ oasc_11_1074.html.

[22] Id. at 33:10.

under Whitmore or Bratton.  Whitmore, 778 N.Y.S.2d at 75; Bratton, 136 S.W.3d at 600, 603.  Sandra and Ray were already in a legal union, therefore, a promise by either to remain in the relationship would not constitute a new promise.

Such promises by Sandra would also be illusory.  An illusory promise is not consideration.

> A promise or apparent promise is not consideration if by its terms the promisor or purported promisor reserves a choice of alternative performances unless
>
> (a) each of the alternative performances would have been consideration if it alone had been bargained for; or
>
> (b) one of the alternative performances would have been consideration and there is or appears to the parties to be a substantial possibility that before the promisor exercises his choice events may eliminate the alternatives which would not have been consideration.

Restatement (Second) of Contracts § 77 (1981).  That is, promises which allow the promisor to choose from a range of alternative return performances, at least some of which would not constitute consideration, cannot constitute consideration.

> Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise.  In such cases there might theoretically be a bargain to pay for the utterance of the words, but in practice it is performance which is bargained for.  Where the apparent assurance of performance is illusory, it is not consideration for a return promise.

Id. at cmt. a (citation omitted).  Consequently, a return performance that is fully optional cannot constitute consideration.  Therefore, a promise of return performance that allows for alternative performances that include not performing, cannot constitute consideration.

Here, the promise, "I promise to work hard in the marriage," would be illusory because Sandra reserved a right to alternative performances—i.e., divorce or separation—which would not constitute consideration. Further, Sandra's performance of the "promise" was entirely optional; that is, there was no consequence or detriment to Sandra for a decision to "breach" the contract by not working hard in the marriage.

Sandra did not make a valid return promise in exchange for Ray's promise to relinquish marital property or make certain payments in the October 6 Document and the MOU. Therefore, the October 6 "agreement" and MOU are voidable by Ray for lack of consideration.

### III. Conclusion

The facts demonstrate that all of the "agreements" are unenforceable. First, the family court correctly found that the Quitclaim Deed was unenforceable as unconscionable. Second, the family court implicitly found that Ray's assent to all of the agreements was involuntary. As involuntariness is a question of fact, the family court may be overturned only if its findings of fact are clearly erroneous. Here, the family court's findings are not clearly erroneous because there is substantial evidence supporting a finding of involuntariness as there is both ample evidence of other circumstances demonstrating involuntariness and the record supports a finding of undue influence. Moreover,

this court should require closer scrutiny of postmarital contracts, by holding that spouses are fiduciaries of the other. Finally, the October 6 Document and the MOU are invalid and unenforceable for lack of consideration.  Instead of protecting vulnerable parties to a postmarital agreement, the majority's holding allows an overreaching spouse seeking to circumvent equitable distribution of marital assets to take financial advantage of a committed partner who is desperately trying to save the marriage.

/s/ Richard W. Pollack